DAVIS ET AL. *v.* MONTGOMERY COUNTY,
MARYLAND ET AL.

[No. 95, September Term, 1972.]

*Decided December 22, 1972.*

The cause was argued before BARNES, SINGLEY, SMITH and DIGGES, JJ., and WILLIAM B. BOWIE, Associate Judge of the Seventh Judicial Circuit, specially assigned.

*Murray L. Deutchman,* with whom were *Bullard & Deutchman* on the brief, for appellants.

*Robert S. Bourbon* for Board of Trustees, part of appellees, with whom were *Richard McKernon, County Attorney* and *Stephen J. Orens, Assistant County Attorney,* on the brief, for Montgomery County, part of appellees, and *Francis B. Burch, Attorney General,* and *Martin B. Greenfield, Assistant Attorney General,* on the brief, for Board of Public Works, other appellee.

BARNES, J., delivered the opinion of the Court.

The appellants, property owners of residential prop-

erty in Takoma Park, Montgomery County, near the Takoma Park campus of Montgomery College, filed a bill of complaint in the Circuit Court for Montgomery County on December 7, 1971, against the appellees, Montgomery County, the Board of Trustees of Montgomery County (Trustees) and the Board of Public Works of the State of Maryland (Board of Public Works), praying for an injunction against the expenditure of certain state and county funds for the expansion of the Takoma Park campus. After an amended bill of complaint was filed on February 7, 1972, with leave of the chancellor, and answers duly filed, the appellees filed motions for summary judgment with supporting affidavits and the appellants filed an opposing affidavit. The principal questions presented to us involve (1) the alleged unconstitutionality of Maryland Code (1957, 1969 Repl. Vol.) Art. 77A, §§ 1-10, and particularly § 1 (d), giving the Trustees power to purchase, lease, condemn or in any other manner acquire real and personal property deemed necessary by them for the operation of the community college, because of an unconstitutional delegation of legislative power; (2) the sufficiency of the counter-affidavit of the appellants to raise genuine issues of material fact in regard to (a) the alleged denial of due process of law resulting from the alleged arbitrary and unreasonable actions of the Trustees and (b) the alleged unconstitutional use of public funds for an option to purchase property owned by a religious organization. The chancellor (Joseph Mathias, J.) granted summary judgments in favor of the defendants below on April 27, 1972; and the plaintiffs below—appellants here—entered a timely appeal from that order.

We have concluded that the chancellor properly entered the order of April 27, 1972; and we will affirm that order.

The affidavit of William C. Strasser, President of the Board of Trustees of Montgomery Community College, sets out most of the relevant facts. It is an elaborate and detailed affidavit, consisting of some 20 pages in the

record extract. The affidavit indicates, in part, the following.

The Maryland-National Capital Park & Planning Commission (Planning Commission) stated in regard to Planning Area X in its Master Plan adopted by Resolution of September 4, 1963, after duly advertised public hearings on March 6 and 7, 1963:

> "Montgomery Junior College occupies only one block in the westernmost corner of the planning area. There is a possibility that the campus will be expanded in the future, in spite of the second junior college under construction north of Rockville. Its down-county location makes it convenient for many—especially part time working students. A logical direction for expansion would be the block northeast of New York Avenue. This would make possible the closing of New York Avenue. Off-street parking is badly needed here."

The area mentioned for possible expansion is Block 69 in Takoma Park bounded by Philadelphia Avenue, Takoma Avenue, New York Avenue and Chicago Avenue and is adjacent to the property of Montgomery College. The appellants own residential properties in Block 69.

In April 1967, a study and recommendation was made by a Professor of Industrial and Technical Education of North Carolina State University in regard to Montgomery College. He recommended the retention of the Takoma Park campus and the acquisition of an additional down-county site. The Trustees, on July 17, 1967, authorized the formation of a Community Advisory Committee for a long-range Master Plan for the college. On January 25, 1968, they adopted a capital budget for the college for the fiscal year 1969 and included in that budget funds to initiate the educational planning for expanded and improved facilities at the Takoma Park campus, as well as funds for site acquisition.

The Community Advisory Committee, at a public ses-

sion (after prior concurrent conferences), recommended on September 19, 1968, that the Rockville campus, due to be completed and to reach capacity enrollment by 1972, be considered as well as an up-county campus along the 70 S corridor beyond Gaithersburg. The Trustees, on November 18, 1968, determined that the Takoma Park campus should be retained and developed and authorized the purchase of the property at 7000 Takoma Park.

A committee, authorized by the Trustees to study educational planning for lower county facilities of the college, presented its detailed recommendations to the Trustees in a public session in March 1969 in regard to the Takoma Park campus and its expansion. The Trustees held a public hearing on these recommendations in May 1969 when at least one of the residents of Block 69 attended but did not oppose at that time the expansion of the Takoma Park campus.

On July 21, 1969, the Trustees petitioned the Montgomery County Council for state aid for the acquisition of land adjoining the existing Takoma Park campus. This petition was referred by the County Council to the State Board for Community Colleges, which, on December 3, 1969, recommended to the Board of Public Works the approval of the request of the Trustees for state assistance for the acquisition of additional land for the Takoma Park campus. The Board, on May 1, 1970, approved an allocation of $325,000 toward the acquisition of 7.9 acres of land for the Takoma Park campus, the Trustees receiving official notice of this authorization on July 13, 1970.

Thereafter, the Trustees approved the appointment of an architectural firm for the Takoma Park project. On May 4, 1971, the Trustees held a public hearing on a feasibility study made by the architects. All residents of Block 69 had been sent personal invitations to appear and present their views. Later in May 1971, the architects were instructed to re-evaluate their proposal to determine if it would be possible to take less of Block 69. The Trustees, on June 14, 1971, in a public session, accepted

the revision of the architects and the construction table proposed by them. Notice was given by the Trustees to the owners of the eight properties immediately affected by the plans for redevelopment of the Takoma Park campus and indicated that the Trustees were "most desirous of obtaining a mutually acceptable and appropriate agreement to purchase their properties." It was also indicated that if no agreement were reached prior to the July 19, 1971, meeting of the Trustees, "more direct, specific action to acquire the properties" would be considered by the Trustees.

The Trustees, on November 1, 1971, approved a Resolution confirming a fixed policy of acquiring no properties beyond Block 69 for the proposed campus expansion, with the possible exception of nearby industrial properties and some land across the railroad tracks. On the same day, the Trustees approved an option to purchase the property 715 New York Avenue (Lot 6-C in Block 69) from The United Church for the Deaf of Washington, D. C., a District of Columbia Corporation, for $117,500. Thereafter, the Trustees and the Board of Public Works approved various options to purchase land for the Takoma Park campus expansion, including the option to purchase 715 New York Avenue from the Church for the Deaf on February 3, 1972.

The affidavit of President Strasser then sets forth several reasons why the project should not be further delayed, *e.g.,* the inadequacy of the present facilities at the Takoma Park campus, the serious overcrowding, the number of chairs in existing classrooms in many areas of the campus exceeding the state guidelines by 30%, the necessity for compliance with certain regulations in regard to air pollution, the need for the continuation of the college at the Takoma Park location to act as a stabilizing influence in the community, the prevention of deterioration of nearby residential areas by acting as a buffer between commercial and residential areas, to supply educational advantages to the increasing number of students in the Takoma Park area who find the Takoma Park lo-

cation convenient and readily available because, in part, of the availability of public transportation, and to prevent the further increase in the costs of completing the project resulting from the delay. Other affidavits in support of the motion by the appellees for summary judgment verified copies of relevant minutes of various state agencies. The affidavit of Robert C. Harrison, Chief of the Land Acquisition Division of the State Department of General Services, and whose duty it was to review all appraisals of land to be acquired in Block 69 by the college for the expansion of the Takoma Park campus, stated:

> "I have examined the two appraisals submitted by the College for the property located at 715 New York Avenue, Takoma Park, Maryland. This property is a church and is in Block 69. Both appraisals arrive at the fair market value of this property by using the reasonable replacement cost of the improvements reduced by the physical and functional depreciation thereof, together with the fair market value of the land.
>
> "I was present at the meeting of the Board of Public Works on February 3, 1972, when the said Board approved the acquisition of this church property for a price less than the lower of these appraisals."

The affidavit of Etta Mae Davis and Dolores Stowell, filed by the appellants in opposition to the summary judgment sought by the appellees, after reciting other matters, attached copies of the options of the Trustees to acquire various properties in Block 69. Then follow Paragraphs 11, 12, 13 and 14:

> "11. The experts of Complainants will testify that the option price on the church property is far above the market value of the property and the price reflects considerations that were not considered in evaluating the residential properties on Block 69.

"12. The considerations given the church property amount to an active discrimination in favor of a religious organization resulting in public funds being spent to favor a religious institution with benefits not available to lay entities;

"13. The Trustees are acting pursuant to authority of the legislature and that authority is granted without any guidelines or standards for the exercise of the authority or discretion granted and that in reaching the decision to expand into Block 69 the Trustees have acted arbitrarily and without just reason;

"14. There is no procedure by which the Trustees have proceeded and in attempting to hold 'public' hearings, they have failed to provide proper notice or any other semblance of due process;"

### 1.

The appellants first contend that Art. 77A, §§ 1-10, and particularly § 1 (d), are invalid as involving an unconstitutional delegation of legislative power. Art. 77A in regard to "Higher Education" has a number of subheadings, *i.e.*, "Community Colleges," "State Colleges," "University of Maryland," "Maryland Council for Higher Education" and "Scholarships." As indicated, the appellants only challenge §§ 1-10 which are the sections under the subheading "Community Colleges."

Art. 77A, § 1 (a) provides for the creation of boards of trustees to establish and maintain community colleges. The board of education of any county and the Board of School Commissioners of Baltimore City until June 30, 1969, with the approval of the State Superintendent of Schools and after July 1, 1969, with the approval of the State Board for Community Colleges (created by § 8), for the purposes of administration over these community colleges "shall constitute a board of trustees and governmental corporation." The board of education, however,

may, pursuant to § 9, transfer its authority and rights under § 1 (a) to boards of trustees established by § 9. The boards of trustees are granted the following powers:

(b) To maintain and exercise general control over the community college, to keep separate records and minutes, and to adopt reasonable rules, bylaws or regulations to effectuate and carry out the provisions of the subtitle.

(c) To appoint a president of the community college, fix his salary and tenure as well as of the faculty and other employees. The president recommends to the trustees the hiring and firing of faculty and other employees, providing that those with tenure have reasonable notice of the grounds of their dismissal and an opportunity to be heard. The president shall be responsible for the conduct of the college and for the administration and subdivision of its departments.

(d) "To purchase, lease, condemn, or in any other manner acquire real and personal property deemed necessary by the board of trustees for the operation of the community college."

(e) To sell, lease, or in any other manner dispose of community college assets at public or private sale, the president of the college and the chairman of the board of trustees being given authority to execute legal conveyances and other documents pursuant to an appropriate resolution of the board of trustees.

(f) To utilize, if permission is duly granted, any land, buildings, personal assets, or other facilities of the board of education.

(g) "To receive local, State, and federal funds to defray the cost of the college program authorized by this subtitle and to accept both conditional and unconditional gifts, as the case may be, from private persons."

(h) To determine entrance requirements and approve curricula, subject to certain limitations.

(i) To charge reasonable fees to students with a view to making college education available at low cost to all qualified persons.

\* \* \*

(k) To enter into agreements or contracts with any person, firm, or corporation, or with any county, State, federal or governmental agencies "which are deemed by the board of trustees to be necessary or advisable to the establishment, maintenance, and operation of the community college. \* \* \*"

(l) To permit a board of education to use the college lands, buildings and other facilities "in connection with any program of secondary or vocational education administered by said board of education, subject, however, until June 30, 1969, to the prior approval of the State Superintendent of Schools, and thereafter of the State Board of Community Colleges."

The definition in § 4 in regard to "Community college" is as follows:

"For the purposes of this subtitle:

"(a) *Community college.*—A community college is defined as an institution of higher education, offering the equivalent of freshman and sophomore years of college work and at least one two-year program of post high school education and performing one or both of the following functions:

"(1) Offering terminal, vocational, technical and semiprofessional programs; or

"(2) Offering terminal nontechnical programs."

Section 9 (as amended by Chap. 303 of the Laws of 1970 and Chap. 223 of the Laws of 1971) provides for the appointment of boards of trustees by the Governor, with the advice and consent of the Senate, upon the re-

quest of the board of education wishing to divest itself of the responsibility for the management and control of the community college or colleges in the political subdivision. As we have observed, when this occurs—as was done in Montgomery County—the new and separate board of trustees has all of the powers and duties of the original board of trustees consisting of the members of the board of education.

The appellants contend that Art. 77A, §§ 1-10, and particularly § 1 (d), are unconstitutional as an attempted delegation of legislative power without proper guides and standards.

We have serious doubts in regard to whether the appellants have standing in this case to raise this issue in view of the fact that their property is not the subject of any condemnation proceedings and, indeed, the properties which have been acquired by the Trustees have been purchased pursuant to Art. 77A, § 1 (k) by making contracts of sale with the property owners involved. The option contract with the Church for the Deaf—715 New York Avenue—was negotiated pursuant to § 1 (k), and not by the exercise of the power of eminent domain. The appellants apparently proceed, however, on the theory of "constructive condemnation," *i.e.*, that the appellant property owners are unwillingly coerced by the threat of condemnation to sell their properties to the Trustees. As we have indicated, the affidavit of President Strasser, filed by the Trustees in support of their motion for summary judgment, does state that on June 14, 1971, the Trustees accepted the revision of the architects, indicated that they were most desirous of reaching agreements to purchase the properties in Block 69, but that if no agreements were reached prior to July 19, 1971, "more direct, specific action to acquire the properties" would be *considered* by the Trustees. It can well be doubted that this rather mild and inconclusive statement by the Trustees can amount to a threat of condemnation sufficient to make applicable the doctrine of "constructive condemnation"; but in view of the posture of the

present case challenging the granting of a summary judgment, we prefer not to pass upon the question of standing and to consider the delegation of legislative power on its merits.

We also doubt that *any guide or standard* is constitutionally required when the State, through an act of the General Assembly, delegates the sovereign power of eminent domain to one of its agencies. It is well settled that a school district or board of education is a proper recipient of the power of eminent domain from the State. 1 *Nichols on Eminent Domain* (3rd ed. Sachman, 1971) § 3.22 [3], at 382. *See Davis v. Board of Education of Anne Arundel County,* 166 Md. 118, 170 A. 590 (1934), *infra.*

Generally speaking, the agency to which the power of eminent domain is delegated stands in the same position of the Legislature, itself. 1 *Nichols, supra,* § 2.31 [3], at 329; and it would appear, therefore, that no guides or standards need be given when the power of eminent domain is delegated. We do not reach this question, however, in that, assuming arguendo that the provision for guides and standards is constitutionally necessary in legislation making the delegation (and also that the appellants have standing to raise the question), we are of the opinion that the guides and standards in the legislation here involved are sufficient.

The appellants rely on the decision of the Supreme Court of the United States in *Schechter Poultry Corp. v. United States,* 295 U. S. 495, 55 S. Ct. 837, 79 L. Ed. 1570 (1935) ; but the full vigor of *Schechter* has been rather reduced by later decisions of the Supreme Court of the United States on this subject. The present federal law in this regard appears to be the test enunciated by Mr. Chief Justice Stone in *Yakus v. United States,* 321 U. S. 414, 64 S. Ct. 660, 88 L. Ed. 834 (1944). Ruling on the constitutionality of the Emergency Price Control Act of 1942, the Chief Justice said the delegation of powers to the Price Administrator would be unlawful, "[o]nly if we could say that there is an absence of standards for

the guidance of the Administrator's action, so that it would be *impossible* in a proper proceeding to ascertain whether the will of Congress has been obeyed. . . ." (Emphasis added.) 321 U. S. at 426, 64 S. Ct. at 668, 88 L. Ed. at 849. *See also Arizona v. California,* 373 U. S. 546, 83 S. Ct. 1468, 10 L.Ed.2d 542 (1963). *Cf. Amalgamated Meat Cutters & Butcher Workmen v. Connally,* 337 F. Supp. 737 (D.D.C. 1971) (Economic Stabilization Act of 1970).

The delegation of the power of eminent domain to the Trustees is limited by the language of § 1 (d) to land *"deemed necessary* by the board of trustees *for the operation of the community college."* (Emphasis supplied.) A similar limitation appears in § 1 (k) in regard to the making of contracts, *i.e.,* those contracts *"deemed* by the board of trustees *to be necessary or advisable* to the establishment, maintenance, and operation of the community college." (Emphasis supplied.) It is thus seen that the exercise of the power of eminent domain must be for the operation of the educational institution involved—a public use. There is little question that boards of education and, *a fortiori,* their successor boards of trustees to operate a community college pursuant to § 9, are a proper recipient of the power of eminent domain. *See Davis v. Board of Education of Anne Arundel County, supra,* 166 Md. 118, 170 A. 590 (1934). Involved in *Davis* was the exercise of the power of eminent domain by the Board of Education of Anne Arundel County granted to that Board by Chap. 157 of the Acts of 1931. The statute provided that, "When land shall be required for the site of a school-house, or for enlarging a school-house lot, or for playgrounds or other school purposes," the Board, after being unable to contract with the owners for the acquisition of the land, "may institute proceedings for the acquisition of such lands. . . ." The same provision, without the 10-acre limitation contained in Chap. 157 of the Acts of 1931, is contained in Code (1957, 1969 Repl. Vol.) Art. 77, § 51.

It was not suggested in the opinion in *Davis* that the

provision "land . . . *required*" (Emphasis added) for the school purposes mentioned was not constitutionally sufficient and apparently the question of any alleged unlawful delegation was not raised in that case.

We, and our predecessors, however, have sustained delegations of legislative power to administrative officials, boards and commissions involving comparable guides and standards or even those less restrictive. *See, e.g., McBriety v. Baltimore City*, 219 Md. 223, 238, 148 A. 2d 408, 418 (1959) [rules and regulations "proper and necessary" to enforce multiple-family dwelling ordinance for protection of the public interest]; *Givner v. Commissioner of Health of Baltimore City*, 207 Md. 184, 191-92, 113 A. 2d 899, 902 (1955) [rules and regulations "necessary and proper" for the enforcement of the health ordinance], citing with approval *Petrushansky v. State*, 182 Md. 164, 32 A. 2d 696 (1943) ["maintain the premises in clean condition"]; *Schneider v. Pullen*, 198 Md. 64, 81 A. 2d 226 (1951) [Private trade schools must obtain certificates of approval by the State Superintendent of Schools where the conditions of entrance, scholarship, educational qualifications, standards and facilities "were adequate and appropriate" for the purposes, program, training and courses to be taught.].

In *Givner*, we said in regard to our prior decisions:

> "The trend of the decisions in the field of administrative law is well illustrated in the zoning cases. In *Tighe v. Osborne*, 150 Md. 452, 457, the right of Baltimore City to delegate part of its police power to a zoning commissioner was sustained even though it involved determinations on his part as to 'whether buildings or the proposed use of them would menace the public security, health or morals.' See also *Heath v. M. & C. C. of Baltimore*, 187 Md. 296, 303, and *Montgomery Co. v. Merlands Club*, 202 Md. 279, 287. The redevelopment cases furnish another illustration. *Matthaei v. Housing Authority*, 177

Md. 506, 516; *Herzinger v. City of Baltimore,* 203 Md. 49, 62. See also *Schneider v. Pullen,* 198 Md. 64, dealing with the sufficiency of standards in a delegation to the Board of Education. In the field of public health, still more flexible standards are permitted. The concept of public health is more definite than that of general welfare, and there is a practical necessity for expert interpretation in its application to concrete situations. See *Boehm v. Baltimore,* 61 Md. 259; *State v. Hyman,* 98 Md. 596; and *Creaghan v. M. & C. C. of Balt.,* 132 Md. 442. In *Baltimore v. Bloecher & Schaaf,* 149 Md. 648, the standard to be observed by the Commissioner of Health was simply whether or not food products were 'unfit for human food'. We think the standard in the instant case is sufficiently definite."
207 Md. at 191-92, 113 A. 2d at 902-03.

See also the provisions of Code (1957, 1972 Cum. Supp.) Art. 89B, § 7 (b) granting the State Highway Administration the same basic power in regard to eminent domain as previously granted to the State Roads Commission with the limitation "acquire . . . by . . . condemnation proceedings . . . land . . . that may be, in its judgment *desirable or necessary* to perform the duties imposed by this article . . . ." (Emphasis supplied.) The exercise of this power by the State Roads Commission was sustained by us in *State Roads Commission v. Franklin,* 201 Md. 549, 95 A. 2d 99 (1953), holding that the question of the necessity for the taking was a legislative one and could only be successfully challenged in the courts when action of the commission in determining the necessity for the taking was "so oppressive, arbitrary or unreasonable as to suggest bad faith" or its exercise of its discretionary power was " 'fraudulent or such abuse of discretion as to amount to a breach of trust.' " 201 Md. at 561, 95 A. 2d at 105.

As we will consider more fully later in this opinion, there was no sufficient allegation of fact in the counter-

affidavit to raise any question of fact in regard to arbitrary, oppressive or unreasonable conduct of the Trustees, suggesting bad faith or any abuse of discretion by the Trustees amounting to a breach of trust.

We conclude that the delegation of the power of eminent domain to the Trustees in the present case was not unconstitutional because of a lack of sufficient guides and standards, assuming, for the argument, that such are constitutionally required in delegations of the power of eminent domain.

## 2.

We now turn to the question of the sufficiency of the allegations of the counter-affidavit to raise a genuine question of a material fact in regard to (a) the supposed denial of due process of law resulting from arbitrary and unreasonable actions of the Trustees and (b) the supposed unconstitutional use of public funds for an option to purchase property owned by a religious organization.

The law in regard to the sufficiency of allegations in a counter-affidavit in summary judgment cases is well settled. As Judge Singley, for the Court, in *Shaffer v. Lohr,* 264 Md. 397, 404, 287 A. 2d 42, 46 (1972), after reviewing the Maryland Law in regard to the limitations upon the summary judgment procedure, aptly stated:

> "We have held that a mere general denial of a plaintiff's claim is not enough to show that there is a genuine dispute as to a material fact and that general allegations which do not show the facts in detail and with precision are insufficient to prevent the entry of a summary judgment, *Frush v. Brooks,* 204 Md. 315, 320-21, 104 A. 2d 624 (1954). The facts proffered in opposition to the granting of a motion for summary judgment must not only be detailed and precise, but must be admissible in evidence, if there is to be a finding that there is a genuine dispute as to a

material fact, *Mullan Co. v. International Corp.*, 220 Md. 248, 257, 151 A. 2d 906 (1959). Even a dispute as to a fact which is not material to the controversy will not prevent the entry of summary judgment, *Meola v. Bethlehem Steel Co.*, 246 Md. 226, 239-40, 228 A. 2d 254 (1967)."

### (a)

In the instant case, the affidavits in support of the motion for summary judgment for the appellees set forth in substantial detail the various hearings, conferences and efforts on the part of the Trustees to give the appellants every opportunity to be heard and to have their positions considered. Indeed, the architects modified their original plan as a result of hearing the views of the appellants. These affidavits established, prima facie, an ample affording of due process of law to the appellants. In Paragraphs 13 and 14 of the counter-affidavit—already quoted in full—only the most general statements are made, *i.e.*, "that in reaching the decision to expand into Block 69 the Trustees have acted arbitrarily and without just reason" and "[t]here is no procedure by which the Trustees have proceeded and in attempting to hold 'public' hearings, they have failed to provide proper notice or any other semblance of due process" without giving a single fact, admissible in evidence or otherwise, to support those broad general statements. The counter-affidavit is clearly insufficient to raise a genuine issue of material fact in regard to a supposed denial of due process of law.

### (b)

The counter-affidavit is also insufficient to raise a genuine issue of material fact in regard to the supposed unconstitutional use of public funds for an option to purchase property owned by the Church for the Deaf.

In Paragraphs 11 and 12 of the counter-affidavit—already quoted in full—it is stated that "[t]he experts of Complainants will testify that the option price on the church property is far above the market value of the

property and the price reflects considerations that were not considered in evaluating the residential properties on Block 69" and that the considerations to the church amount to an "active discrimination in favor of a religious organization resulting in the spending of public funds . . . to favor a religious institution with benefits not available to lay entities."

We sustained the constitutionality of Code (1957, 1971 Repl. Vol.) Art. 33A, § 5 (d) in regard to damages to be paid to churches in eminent domain proceedings, as interpreted by us, in *Mayor & City Council of Baltimore v. The Concord Baptist Church, Inc.*, 257 Md. 132, 262 A. 2d 755 (1970). Judge Singley, for the Court, stated that the proper interpretation of this statute was:

"To us, the language of the present Act 'the damages to be awarded * * * shall be the reasonable cost as of the valuation date, of erecting *a new structure of substantially the same size and of comparable character and quality of construction* * * *' (emphasis supplied), means the cost of reproducing or replacing the improvements, adjusted for physical and functional depreciation, to which shall be added the fair market value of the land. We must conclude that the legislative intent, as revealed by the Act, was to give to church property no benefit greater than that which would be accorded the owner of any other service property, despite the omission of other kinds of service property from § 5 (d).

" 'Aside from serving as an upper limit to appraisals based on other methods of valuation, another important use for which the best appraisal authorities justify reproduction cost is in the case of so-called "service properties", that are owned for nonprofit uses and that seldom come on to the market. Churches, club-houses, golf-courses,

school and university buildings are of this nature. Neither their market value (if they have any) nor their value to their owners can be estimated by recent sales or by a capitalization of net earnings. In the absence of either of these more reliable tests of value, an appraiser can do little but add the structural costs of the building to the market value of the vacant land, with some arbitrary deductions for physical and functional depreciation. The resulting figure ordinarily sets an upper limit to the worth of the property to the owner, and it roughly measures that value on the assumption that the owner would find it worth while to replace the structures with substantially identical ones in case they were destroyed. * * *' 2 Orgel, *supra*, § 188 at 4."
(Emphasis in original opinion)
257 Md. at 143-44, 262 A. 2d at 761.

*A fortiori,* a payment for church property acquired by a state agency for a public use based upon the same formula as required by Art. 33A, § 5 (d) to be used in condemnation cases, would not violate any provisions of the federal or state constitutions in regard to the establishment of religion, equal protection or due process of law.

It is clear to us that nothing in this situation, prima facie, indicates any fostering of excessive "governmental entanglement of religion." *See Tilton v. Richardson,* 403 U. S. 672, 687-88, 91 S. Ct. 2091, 2100, 29 L.Ed.2d 790, 804 (1971).

The supporting affidavit of Robert C. Harrison, already mentioned, established that the two appraisals for the church property located at 715 New York Avenue in Block 69 on which the college relied in making the purchase "arrive at the fair market value of this property by using the reasonable replacement cost of the improve-

ments reduced by the physical and functional depreciation thereof, together with the fair market value of the land" and further that he was present at the meeting of the Board of Public Works on February 3, 1972, when the acquisition of the church property was approved "for a price less than the lower of these appraisals." Mr. Harrison's affidavit establishes, prima facie, that there was full compliance with the applicable law in the acquisition of the church property and that, in fact, no discriminatory overpayment for that property was made. Here again, the counter-affidavit filed on behalf of the appellants only alleges conclusions and no facts in Paragraphs 11 and 12, already set out in full. Indeed, even the conclusion that experts of the Complainants "will testify" that the option price on the church property is far above the market value of the property and the price reflects considerations that were not considered in evaluating the residential properties on Block 69 is plainly hearsay and not admissible in evidence and hence insufficient under the provisions of Rule 610 b.

The statement in Paragraph 12 that "The considerations given the church property amount to an active discrimination in favor of a religious organization . . ." is also conclusory. No facts are stated to indicate any supposed "discrimination."

The appellants indicated in their brief and in the argument before us that the chancellor refused their request to require the appellees to produce the two appraisal reports used by the college in connection with the purchase of the church property and that this refusal presented them with "problems." There is, however, nothing in the counter-affidavit setting forth that they "cannot for reasons stated present by affidavit facts essential to justify . . . [their] opposition," seeking to avail themselves of the relief provided for in Rule 610 d 2. Having failed to raise this question below as provided for in Rule 610 d 2, it cannot be raised now for the first time on appeal. Rule 885.

The appellees, in addition to the question of the stand-

476

ing of the appellants to sue—which we have already stated we do not find it necessary to decide—have raised the question of laches on the part of the appellants. The chancellor did not find it necessary to rule on this question, nor do we, although it may well have merit.

*Order of April 27, 1972, affirmed, the appellants to pay the costs.*