532 A.2d 1056

**DEPARTMENT OF TRANSPORTATION et al.**

v.

**John L. ARMACOST et al.**

**No. 5, Sept. Term, 1987.**

Court of Appeals of Maryland.

Nov. 3, 1987.

Ralph S. Tyler, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Andrew H. Baida, Ann Marie DeBiase and Edward R.K. Hargadon, Asst. Attys. Gen., on brief), Baltimore, for appellants.

William L. Reynolds and Shale D. Stiller (Samuel A. Belcher and Frank, Bernstein, Conaway & Goldman, Baltimore and Charles W. Thompson, Jr., Co. Atty. for Carroll County, Westminster, on brief), for appellees.

Argued before MURPHY, C.J., ELDRIDGE, COLE, RODOWSKY, McAULIFFE and ADKINS, JJ., and JAMES F. COUCH, Jr., Associate Judge of the Court of Appeals of Maryland (retired) Specially Assigned.

MURPHY, Chief Judge.

The issue presented is whether the General Assembly, in enacting Maryland's Vehicle Emissions Inspection Program (VEIP), Maryland Code (1987 Repl.Vol.) §§ 23–201 through 23–208 of the Transportation Article, violated the separation of powers provisions of Article 8 of the Maryland Declaration of Rights by unconstitutionally delegating legislative power to an administrative agency.[1]

---

1. Article 8 provides:

I

In 1970, Congress enacted the Federal Clean Air Act to combat the growing problem of air pollution caused, in part, by the increasing use of motor vehicles. 42 U.S.C. § 7401(a)(2) (1982).[2] Among the Act's purposes was the protection of public health by improving the quality of the nation's air. § 7401(b)(1). While placing primary responsibility for the prevention and control of air pollution with the states, § 7401(a)(3), the Act empowered the Administrator of the Federal Environmental Protection Agency (EPA) to establish national ambient air quality standards for various pollutants, and to promulgate rules and regulations for attaining those standards.[3] § 7409. The Act authorized the EPA to divide the country into "air quality control region[s]." § 7407(c). It required each state to submit for EPA approval a "state implementation plan" (SIP), setting forth the state's program for achieving the requisite air quality standards in each of its control regions by 1975. § 7410.

Amendments to the Clean Air Act in 1977 extended the submission date of a SIP to January 1, 1979, for states with "nonattainment areas," i.e., regions that had failed to meet the air quality standards by 1975. § 7501(2). National air quality standards were to be attained "as expeditiously as practicable," but no later than December 31, 1982. § 7502(a)(1). States unable by 1982 to achieve the national standards for two particular pollutants—photochemical oxidants and carbon monoxide—could request an extension until December 31, 1987. § 7502(a)(2). In exchange for

---

"That the Legislature, Executive and Judicial powers of Government ought to be forever separate and distinct from each other; and no person exercising the functions of one of said Departments shall assume or discharge the duties of any other."

2. All section references to the United States Code, unless otherwise specified, are to the most recent edition of 42 U.S.C.

3. National ambient air quality standards were established for six pollutants—sulfur oxides, carbon monoxide, ozone, particulate matter, nitrogen dioxide, and lead. 40 C.F.R. §§ 50.4–.12 (1986).

this extension, however, a state's SIP had to "establish a specific schedule for implementation of a vehicle emission control inspection and maintenance program...." § 7502(b)(11)(B). Noncompliance could result in a loss of federal highway funds, § 7506(a), and of sewage treatment plant construction grants, § 7616.

Two of Maryland's six air quality control regions were found by both the State and the EPA to be nonattainment areas for ozone and carbon monoxide standards. These two regions were the Metropolitan Baltimore Intrastate Air Quality Control Region, consisting of Baltimore City and Anne Arundel, Baltimore, Carroll, Harford, and Howard Counties, and the Maryland portion of the National Capital Interstate Air Quality Control Region, consisting of Prince George's and Montgomery Counties.[4] Because the requisite air quality standards for ozone and carbon monoxide could not be attained in these two regions by the 1982 deadline, the State, in January 1979, formally requested an extension of the EPA deadline.

Maryland's VEIP, codified within the Transportation Article as Title 23, Subtitle 2, was enacted by ch. 421 of the Acts of 1979. As originally enacted, § 23-201 defined "Emissions standard" in terms of a limitation upon "the quantity, quality, rate, or concentration of emissions from a motor vehicle," including a requirement that "relates to the operation or maintenance of a motor vehicle to assure continuous emission reduction."

Section 23-202(a) required that by October 1, 1979, the MVA publish "proposed rules and regulations providing, to the extent required by federal law, for the establishment of

---

**4.** Maryland's other regions are: the Cumberland–Keyser Intrastate Air Quality Control Region (Allegany, Garrett, and Washington Counties); the Central Maryland Intrastate Air Quality Control Region (Frederick County); the Southern Maryland Intrastate Air Quality Control Region (Charles, St. Mary's, and Calvert Counties); and the Eastern Shore Intrastate Air Quality Control region (Cecil, Kent, Queen Anne's, Talbot, Caroline, Dorchester, Worcester, Wicomico, and Somerset Counties). *See* 40 C.F.R., Part 81, Subpart B (1986).

an emissions inspection program to commence no earlier than July 1, 1980 and no later than December 31, 1982." Prior to drafting the proposed rules, the MVA was required by this subsection to conduct two public hearings, one each in the Washington and Baltimore metropolitan areas, in order to receive public comment. The MVA was required by the statute to submit its proposed rules and regulations to each House of the General Assembly by a specified date in 1980; it was also required to conduct public education and awareness programs on a regular basis "to inform the citizens concerning the benefits of the emissions program." The subsection specified that after December 31, 1983, the inspection program would be mandatory for all motor vehicles in the State "not otherwise exempted." It provided that unless legislation established a different program at the 1980 session of the General Assembly, "the proposed rules and regulations, with any amendments that shall have been concurred in by joint resolution of the General Assembly, shall take effect as provided in the rules and regulations."

Section 23–202(b) required that an inspection system be established in the State "for annual inspection, under a schedule adopted by the [MVA] Administrator, of those motor vehicles required to be inspected." It mandated the construction of inspection facilities in strategic locations "that will best serve the public convenience." Section 23–202(c). Section 23–203 directed that the MVA provide in its rules and regulations "for the establishment of inspection facilities." Section 23–204 required that the inspection determine "whether each vehicle complies with the emission standards established under this subtitle for that vehicle," and that the MVA set the fee for the inspection within specified limits. Section 23–205. Section 23–206 required owners of motor vehicles registered in Maryland to "have the vehicle inspected, as required under this subtitle." Section 23–207 authorized the MVA to adopt rules and regulations "as required for purposes of implementation, administration, regulation, and enforcement of the provisions of

this subtitle, including rules and regulations that, consistent with federal law, exempt certain vehicles from the inspections under this subtitle." This section also directed the Secretary of Health and Mental Hygiene,[5] with the concurrence of the Secretary of Transportation, to publish rules and regulations establishing "emission standards to be used for the inspection of motor vehicles under this subtitle." [6]

The VEIP was amended by the General Assembly during its 1980, 1981, 1982, 1983, and 1985 sessions. *See, e.g.*, ch. 725 of the Acts of 1980 (start of the mandatory VEIP extended to "[a]fter December 31, 1982"); ch. 492 of the Acts of 1982 (extended to "[a]fter June 30, 1983"); ch. xxxxxxx 312 of the Acts of 1983 (start-up postponed until after December 31, 1983). The amendments also increased the inspection fee, ch. 725 of the Acts of 1980; allowed the MVA to issue hardship waivers, ch. 517 of the Acts of 1983, and waivers for any vehicle that failed the emissions test if the owner had actually spent a specified amount for repairs to the vehicle, ch. 725 of the Acts of 1980; exempted ambulances from VEIP inspection, ch. 549 of the Acts of 1983; and instructed the Secretaries of the Environment and Transportation to jointly report to designated legislative committees as to any modifications to the Federal Clean Air Act. *See* ch. 492 of the Acts of 1982; ch. 19 of the Acts of 1985. The 1982 amendments also created a special joint committee on VEIP, comprised of three senators and three delegates to "regularly consult" with the Secretary of Transportation on the administration of the VEIP. In addition, ch. 106 of the Acts of 1985 (the Budget Bill) required an evaluation by the Departments of Transportation and Health and Mental Hygiene of the VEIP's effectiveness. During its 1986 session, the legislature

---

**5.** Now the Secretary of the Environment.

**6.** Regulations detailing the administration of the VEIP are found at COMAR §§ 11.14.06.01–.16; regulations setting forth the necessary vehicle exhaust emissions standards, as well as procedures for inspecting exhaust emissions, and specifications for the inspection testing equipment, are found at COMAR §§ 10.18.11.01–.06.

passed Senate Joint Resolution 22 calling for the establishment of a VEIP Task Force to "review options and make recommendations for the future of the Vehicle Emissions Inspection Program." The Task Force, which was composed, inter alia, of three delegates, three senators, and representatives from the Department of Transportation and the Department of Health and Mental Hygiene, issued its findings and recommendations to the General Assembly and the Governor in January 1987.

## II

On January 11, 1984, the County Commissioners of Carroll County, in their individual and official capacities, the town of Mt. Airy, its mayor, and a resident of Carroll County (appellees) filed a petition for declaratory judgment and an interlocutory injunction in the Circuit Court for Carroll County. Named as defendants were the Department of Health and Mental Hygiene, the Department of Transportation, and the MVA (the State). The appellees challenged the constitutionality of the VEIP's application to Carroll County, raising the issues of equal protection, substantive and procedural due process, illegal search and seizure, and unlawful taking of property. On January 31, 1984, the court (Gilmore, J.) entered an interlocutory order enjoining the enforcement of the VEIP in Carroll County.

On appeal, we vacated the interlocutory injunction and remanded the case to the lower court for further proceedings. We held that: the VEIP's tailpipe tests did not constitute a search and seizure within the meaning of the fourth amendment; that the inclusion of Carroll County and the exclusion of other rural counties in the VEIP was not a violation of equal protection because Carroll County was part of a "nonattainment area" for ozone; that COMAR § 11.14.06.05 exempting certain classes of vehicles from the program did not violate equal protection because a rational basis existed for the exemptions; that the VEIP provided adequate procedures to safeguard procedural due process interests of vehicle owners; that the suspension or revoca-

tion of vehicle registration under the program was not a taking in violation of either the State or the Federal Constitution; that Carroll County's inclusion in the VEIP was not a violation of substantive due process; and that the MVA had implicit authority to amend the regulations implementing the inspection program. *Department of Transportation v. Armacost*, 299 Md. 392, 474 A.2d 191 (1984) (*Armacost I*).

Upon remand, the circuit court (Gilmore, J.), ruling on the parties' cross-motions for summary judgment, held that § 23–202 and § 23–207 of the Transportation Article constituted an unlawful delegation of power from the legislature to an administrative agency in violation of Article 8 of the Maryland Declaration of Rights. Specifically, the court concluded that § 23–202 did no more than require the MVA to publish rules and regulations "to the extent required by federal law" and to establish an inspection system within Maryland. Further, the court stated that while § 23–207 requires that the rules and regulations adopted by the MVA be "consistent with federal law," the statute did not "set forth sufficient guidelines for the MVA to determine what persons, vehicles, and geographic areas should be included in the program." The court said that the powers vested in the MVA to make rules and regulations did not permit it to make laws. Thus, the court said, "in applying the program only to the Baltimore and Washington Metropolitan Regions, and not to the State as a whole, as provided for in § 23–202(b), the MVA restricted the Act being administered and, in doing so, legislated." It concluded that "the delegation of power by the Legislature was too broad and failed to provide adequate guidelines and thus ... was unconstitutional and the statutes and regulations in question are invalid." Judge Gilmore granted summary judgment for the appellees, and the State appealed to the Court of Special Appeals.[7] We granted certiorari prior to argument in the

---

7. The court issued a permanent injunction but stayed its order, pending the disposition of all appeals.

intermediate appellate court to consider the important issue raised in the case.

## III

Our cases have long sanctioned delegations of legislative power to administrative officials where sufficient safeguards are legislatively provided for the guidance of the agency in its administration of the statute. *See, e.g., Sullivan v. Bd. of License Comm'rs,* 293 Md. 113, 121, 442 A.2d 558 (1982); *Governor v. Exxon Corp.,* 279 Md. 410, 370 A.2d 1102 (1977), *aff'd,* 437 U.S. 117, 98 S.Ct. 2207, 57 L.Ed.2d 91 (1978); *County Council v. Investors Funding,* 270 Md. 403, 442, 312 A.2d 225 (1973). As these cases indicate, the statutory guidelines serve not only to reduce the possibility of an arbitrary exercise of administrative discretion but also assist a reviewing court in determining the validity of agency action. The trend of the cases, as we pointed out in *Investors Funding, supra,* 270 Md. at 442, 312 A.2d 225 "is toward greater liberality in permitting grants of discretion to administrative officials, particularly in the fields of public health and safety, in order to facilitate the administration of the laws as the complexity of governmental and economic conditions increase." Consistent with this view, we have upheld broad delegations of legislative power to administrative agencies in numerous case. *See, e.g., Sullivan, supra,* 293 Md. at 123, 442 A.2d 558 (authorizing the adoption of rules and regulations by a liquor licensing board as may be necessary "to effectively administer the law and to foster and promote temperance"); *Governor v. Exxon Corp., supra,* 279 Md. at 415, 370 A.2d 1102 (statute authorizing the Comptroller of the Treasury to adopt " 'rules or regulations defining the circumstances in which a producer or refiner temporarily may operate a previously dealer-operated station,' " and to permit " 'reasonable exceptions to the divestiture dates,' " by which producers or refiners of petroleum products are required to divest themselves of ownership of retail service stations in the State); *Montgomery County v. Walsh,* 274 Md. 502,

523, 336 A.2d 97 (1975) (statute authorizing the County Executive to adopt " 'reasonable and necessary rules and regulations' " for the implementation of the Montgomery County Financial Disclosure Ordinance which required the filing of such financial disclosure statements " 'as might be desirable to promote the trust and confidence of the citizens of the County in the . . . County government' "); *Davis v. Montgomery County*, 267 Md. 456, 464, 298 A.2d 178 (1972) (statute authorizing boards of trustees of community colleges to adopt " 'reasonable rules, bylaws or regulations' " to effectuate and carry out the provisions of the statute relating to the establishment and maintenance of community colleges); *McBriety v. Baltimore City*, 219 Md. 223, 238, 148 A.2d 408, 418 (1959) (statute authorizing the building inspection engineer, the commissioner of health, and the chief of the fire department to adopt rules and regulations "proper and necessary" to enforce multiple-family dwelling ordinance for the protection of the public interest); *Givner v. Commissioner of Health*, 207 Md. 184, 187–88, 113 A.2d 899 (1955) (statute authorizing commissioner of health to adopt rules and regulations "proper and necessary" for the enforcement of a health ordinance pertaining to bathing facilities in dwelling units).

In concluding that broad delegations of legislative authority to administrative agencies is particularly appropriate in the areas of public health and safety, we explained in *Givner, supra,* 207 Md. at 191, 113 A.2d 899:

> "In the field of public health, still more flexible standards are permitted. The concept of public health is more definite than that of general welfare, and there is a practical necessity for expert interpretation in its application to concrete situations."

*See also Med. Discipline v. Stillman,* 291 Md. 390, 414, 435 A.2d 747 (1981); *Petrushansky v. State,* 182 Md. 164, 174, 32 A.2d 696 (1943); *Tighe v. Osborne,* 150 Md. 452, 460–61, 133 A. 465 (1926). We have also relaxed the general rule that a statute vesting discretion in administrative officials

without fixing any standards for their guidance is an unconstitutional delegation of legislative power

> "where the discretion to be exercised relates to police regulations for the protection of public morals, health, safety, or general welfare, and it is impracticable to fix standards without destroying the flexibility necessary to enable the administrative officials to carry out the legislative will, legislation delegating such discretion without such restrictions may be valid." *Pressman v. Barnes,* 209 Md. 544, 555, 121 A.2d 816 (1956).

In certain circumstances, the expert assistance afforded by administrative agencies is so important to public health that we have found implied limitations on agency discretion when none has been expressed in the statutory language. *See Truitt v. Board of Public Works,* 243 Md. 375, 391, 221 A.2d 370 (1966). In this regard, "it is manifestly impractical for the legislature to set specific guidelines to govern the day-to-day exercise of the rule-making power." *Sullivan, supra,* 293 Md. at 122–23, 435 A.2d 747. Of course, agency rules and regulations must be reasonable and consistent with the letter and spirit of the law under which the agency acts. *Baltimore v. William E. Koons, Inc.,* 270 Md. 231, 310 A.2d 813 (1973); *Comptroller v. Rockhill, Inc.,* 205 Md. 226, 107 A.2d 93 (1954).[8]

---

8. Not all legislative delegations of authority to administrative agencies have been upheld. A statute giving a County Commission on Landlord–Tenant Affairs discretion to fix civil penalties in any amount up to $1,000 completely "lack[ed] any legislative safeguards or standards," *County Council v. Investors, supra,* 270 Md. at 442, 312 A.2d 225; a statute prohibiting the holding of various types of public entertainment in Baltimore City without first paying a fee between $5 and $100 as set by the Police Commissioner contained no standard to control the Commission's discretion, *Theatrical Corp. v. Brennan,* 180 Md. 377, 385, 24 A.2d 911 (1942).

Under the separation of powers doctrine, we have not permitted the imposition of one governmental branch's duties or privileges upon another branch. *See, e.g., Attorney General v. Waldron,* 289 Md. 683, 426 A.2d 929 (1981) (Legislature may not enact a statute that effectively denies attorneys the right to practice law since only the Judiciary may determine eligibility to practice law); *Reyes v. Prince George's County,* 281 Md. 279, 380 A.2d 12 (1977) (Article 8 of the Declaration

The State maintains that the delegation of authority to the MVA and to the Department of Health and Mental Hygiene under the statutes, and particularly §§ 23–202 and 23–207, contains sufficient specific directives to the agencies and is therefore valid and constitutional. It says that the MVA, under the VEIP legislation, is required to comply with clearly articulated legislative standards in the administration of the emissions inspection program. The State argues that both §§ 23–202 and 23–207, in express terms, incorporate the detailed standards imposed by the Clean Air Act and its regulations and therefore contain constitutionally sufficient limitations upon the discretion vested in the administrative agencies in bringing the State's nonattainment areas into compliance with the national ambient air quality standards set by the EPA. According to the State, the "touchstone" of the VEIP is the Federal Clean Air Act and its regulations; it is the federal law which furnishes the context for interpreting the VEIP legislation. The General Assembly, the State urges, made the fundamental policy decisions when it enacted the state law, leaving to the agencies the task of implementing those decisions. In particular, the State invites attention to the Preamble to ch.

---

of Rights and Article IV of the Maryland Constitution prohibit courts from rendering advisory opinions requested by the legislative or executive branch prior to actual litigation); *Shell Oil v. Supervisor,* 276 Md. 36, 343 A.2d 521 (1975) (statute conferring adjudicatory functions on the Maryland Tax Court, an administrative agency, does not confer on it judicial functions as well; any attempt to authorize an administrative agency to perform a purely judicial function or power would violate the separation of powers principle); *Ahlgren v. Cromwell,* 179 Md. 243, 17 A.2d 134 (1941) (statute authorizing the Governor to extend the merit system to employees excepted from, or not included in, the merit system violates Article 8 because it effectively authorizes an amendment of a legislative act by an order of the Governor); *Board of Supervisors v. Todd,* 97 Md. 247, 54 A. 963 (1903) (statute requiring circuit court judges to order an election if voters wanted to vote on whether to grant liquor licenses imposed a nonjudicial duty on the judges and thus violated Article 8). The principle that the Legislature may not constitutionally impose a nonjudicial function upon the courts was most recently applied in *Duffy v. Conaway,* 295 Md. 242, 455 A.2d 955 (1983).

492 of the Acts of 1982 in which the General Assembly recited its purpose "to pursue, in good faith, the attainment of the ambient air quality standards established by the U.S. Environmental Protection Agency."

The State contends that the Legislature may, and did, embrace federal standards in directing its administrative agencies to adopt rules and regulations in compliance with the federal requirements. As the federal law requires only that the VEIP be established in the State's two nonattainment regions, the State says that the MVA properly so limited the program's scope in accordance with the statutory policy prescribed by the Legislature.

In support of the circuit court's holding, the appellees argue that the VEIP does not incorporate the detailed standards imposed by the Clean Air Act, nor does it impose specific federal rules by adopting them as state law. They suggest that the sole legislative standard provided by the VEIP pertains to goals in the federal statute, which by its very terms requires that the choices be made only by the states. They claim that the federal law affords broad latitude to the states in determining the contents of their plan and specifically provides that the SIP specify the manner in which national primary and secondary ambient air quality standards will be achieved and maintained. The appellees argue that in enacting the VEIP legislation, the Legislature "made no policy decisions" and gave "no legislative directives, policies or standards to guide the MVA." As a consequence, it is argued that "all the key decisions involving the scope of the VEIP were made by the MVA" in violation of the delegation doctrine and Article 8 of the Declaration of Rights. Those key decisions, according to appellees, included (1) the relationship between stationary and vehicular emissions; (2) the designation of the counties which would be part of the VEIP; (3) the permissible level of pollutants from each vehicle or class of vehicles; (4) the types of vehicles excluded from the program; and (5) how

long a vehicle has to be tested. As to these, the appellees suggest that the MVA was given complete freedom to design any program it wished to implement and thus the discretion vested in the agency was wholly unchanneled.

The appellees agree that the constitutional test, under the delegation doctrine, is whether the General Assembly provided sufficient legislative guidelines to limit adequately the exercise of discretion by administrative officials. The appellees suggest that the delegation doctrine "has been infused with renewed vitality in recent years," and they rely in particular on a spate of late Supreme Court separation of powers cases in support of this view.[9] In light of these cases, they maintain that even if the MVA regulations contain provisions for the protection of public health, nevertheless the current governing law would not find it impracticable for the Legislature to establish standards without destroying the flexibility needed by administrative officials in administering a vehicle emissions program.

## IV

The delegation doctrine, prohibiting a legislative body from delegating its law-making function to any other branch of government or entity is a corollary of the separation of powers doctrine which underlies both the Maryland and Federal Constitutions.[10] Steeped in the political theories of Montesquieu and Locke, those who framed the constitutions of our states and of the federal government believed that separating the functions of government and assigning the execution of those functions to different

---

**9.** *See Bowsher v. Synar*, 478 U.S. 714, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986); *Immigration & Naturalization Service v. Chadha*, 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983); *Northern Pipeline Co. v. Marathon Pipeline Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982).

**10.** There is no express provision in the federal constitution with respect to the separation of powers among the three branches.

branches was fundamental to good government and the preservation of civil liberties.[11]

Only twice in its history has the Supreme Court invalidated congressional grants of legislative authority to the Executive Branch.[12] Early cases found the Court willing to uphold delegations of power for fact-finding necessary for suspending or effectuating legislation. *See Cargo of the Brig Aurora v. United States,* 11 U.S. (7 Cranch) 382, 3 L.Ed. 378 (1813); *Field v. Clark,* 143 U.S. 649, 12 S.Ct. 495, 36 L.Ed. 294 (1892); *Wayman v. Southard,* 23 U.S. (10 Wheat.) 1, 6 L.Ed. 253 (1825); *United States v. Grimaud,* 220 U.S. 506, 31 S.Ct. 480, 55 L.Ed. 563 (1911). The Supreme Court first articulated a rule by which to judge the constitutionality of congressional delegations of power in *J.W. Hampton, Jr. & Co. v. United States,* 276 U.S. 394, 48 S.Ct. 348, 72 L.Ed. 624 (1928). That case concerned a delegation to the President of the power to set tariff rates that would equalize production costs in the United States and competing countries. The Court upheld the delegation, concluding:

"If Congress shall lay down by legislative act an intelligible principle to which the person or body authorized to fix such rates is directed to conform, such legislative action is not a forbidden delegation of legislative power" 276 U.S. at 409, 48 S.Ct. at 352.

The Court thereafter upheld transfers to administrative agencies of legislative authority broader than those of previous delegations. *See, e.g., New York Central S. Co. v. United States,* 287 U.S. 12, 24, 53 S.Ct. 45, 48, 77 L.Ed. 138 (1932) (power given to the Interstate Commerce Commission to regulate the ownership and control of railroad systems under a "public interest" standard); *Radio Comm'n v.*

---

**11.** For a discussion of the influence of Locke's and Montesquieu's political theories on colonial America, *see* M. Vile, *Constitutionalism and the Separation of Powers* (1967).

**12.** A third case in which the Supreme Court invalidated a delegation of legislative authority was *Carter v. Carter Coal Co.,* 298 U.S. 238, 56 S.Ct. 855, 80 L.Ed. 1160 (1936). However, this delegation was to private parties, not to the Executive Branch.

*Nelson Bros. Co.,* 289 U.S. 266, 285, 53 S.Ct. 627, 636, 77 L.Ed. 1166 (1933) (FCC authorization to assign radio frequencies under a "public interest" standard was not so "indefinite as to confer an unlimited power"); *FTC v. R.F. Keppel & Bro.,* 291 U.S. 304, 309–12, 54 S.Ct. 423, 425–26, 78 L.Ed. 814 (1934) (FTC statutory power to issue orders to eliminate "unfair methods of competition" not an unlawful delegation).

The Supreme Court, in 1935, twice departed from its earlier holdings validating broad delegations of legislative power. *Panama Refining Co. v. Ryan,* 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446 (1935) concerned § 9(c) of the National Industrial Recovery Act (NIRA) of 1933 which authorized the President to prohibit interstate shipments of "hot oil," *i.e.,* oil produced or withdrawn from storage contrary to state law. The Court determined that § 9(c) was unconstitutional because it provided no criteria to guide the President in deciding when to prohibit "hot oil" transports. In *A.L.A. Schechter Poultry Corp. v. United States,* 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570 (1935), the Court examined central provisions of the NIRA that authorized the President to approve codes of "fair competition" upon application by trade or industrial associations. The Court invalidated the delegation, finding that the "fair competition" standard did not refer to a "category established in law" that could be used as a restriction on code-making; rather, it was a

"'convenient designation for whatever set of laws the formulators of a code for a particular trade or industry may propose and the President may approve ... as being wise and beneficient provisions for the government of the trade or industry in order to accomplish the broad purpose ... stated in the first section of Title I.'" 295 U.S. at 531, 55 S.Ct. at 843.

Following *Schechter,* the Court refined the criteria used to determine the scope of a legislative delegation's constitutionality. *Yakus v. United States,* 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834 (1944) sustained a wartime measure that

gave an administrative agency extensive powers to fix commodity prices under a statutory standard of "generally fair and equitable." The Court there stated, 321 U.S. at 426, 64 S.Ct. at 668, that legislative standards must enable a court, upon review, to ascertain whether an administrative agency had followed the legislative will.

> "Only if we could say that there is an absence of standards for the guidance of the Administrator's action, so that it would be impossible in a proper proceeding to ascertain whether the will of Congress has been obeyed, would we be justified in overriding its choice of means for effecting its declared purpose of preventing inflation."

After *Yakus,* the Court continued to uphold broad standards for congressional delegations. *See, e.g., U.S. v. Southwestern Cable Co.,* 392 U.S. 157, 88 S.Ct. 1994, 20 L.Ed.2d 1001 (1968) (upholding FCC cable TV regulations promulgated under Communications Act of 1934 even though the Court acknowledged that Congress could not have foreseen the development of cable TV when it passed the Act); *Arizona v. California,* 373 U.S. 546, 83 S.Ct. 1468, 10 L.Ed.2d 542 (1963) (giving broad discretion to Secretary of Interior to apportion Colorado River water rights); *Lichter v. United States,* 334 U.S. 742, 68 S.Ct. 1294, 92 L.Ed. 1694 (1948) (upholding statutory standard of "excessive profits"); *Federal Power Com'n v. Hope Natural Gas Co.,* 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944) (upholding statutory standard of "just and reasonable"). The delegation doctrine thus returned to its pre-*Schechter* dormancy to the extent that some commentators have considered it a "dead letter" of constitutional law.[13]

---

**13.** *See, e.g.,* S. Barber, *The Constitution and the Delegation of Congressional Power* 76 (1975); I.K. Davis, *Administrative Law Treatise* § 3:1 at 149–50 (2d ed. 1979); R. Rotunda, J. Nowak & J. Young, *Treatise on Constitutional Law: Substance and Procedure* § 4.7 at 286 (1986); Aranson, Gellhorn & Robinson, "A Theory of Legislative Delegation," 68 Cornell L.Rev. 1, 12 (1982).

On occasion, the Court has shown an unwillingness to construe broadly the scope of a delegation of legislative authority that otherwise might impinge on constitutionally protected rights. *See, e.g.,*

The Supreme Court cases upon which appellees place reliance, and from which they claim a revitalization of the delegation doctrine, *see* n. 13, *supra*, although perhaps signaling a stricter application of the separation of powers doctrine, were not decided on principles governing delegation of legislative authority to administrative agencies. *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 held unconstitutional a provision of the Federal Election Campaign Act because it violated the Appointments Clause of the Constitution, an Article II power. *Northern Pipeline Co. v. Marathon Pipe Line Co.*, *supra*, invalidated the Bankruptcy Act's grant of Article III–like jurisdiction to the Bankruptcy Court's nonarticle III judges. *INS v. Chadha*, *supra*, held unconstitutional the legislative veto provision of the Immigration Act. *Bowsher v. Synar*, *supra*, invalidated the Gramm–Rudman–Hollings Act because it authorized the Comptroller General, a legislative officer, to execute the Act.

■ Our own cases have never interpreted the separation of powers doctrine embedded in Article 8 of the Maryland Declaration of Rights as imposing a complete separation between the branches of government. *See Baltimore v. State*, 15 Md. 376 (1860). In that early case, the Court acknowledged that "the words of the Article ... have not been accepted in their literal sense." *Id.* at 459. More recently, in *Dep't of Nat. Res. v. Linchester*, 274 Md. 211,

---

*Greene v. McElroy*, 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959) (refusing to imply, in a congressional delegation of power to the Defense Department, the ability to administer a constitutionally questionable security clearance program); *Kent v. Dulles*, 357 U.S. 116, 78 S.Ct. 1113, 2 L.Ed.2d 1204 (1958) (Court refused to construe legislation as delegating to the Secretary of State the power to deny passports to persons refusing to disclose whether they had ever had Communist-party affiliations). In *National Cable Television Assn. v. U.S.*, 415 U.S. 336, 94 S.Ct. 1146, 39 L.Ed.2d 370 (1974), the Supreme Court also narrowly construed an appropriations statute to benefits conferred on private individuals and not to recover the full costs of regulating as the FCC had tried. A contrary result would have been, in the Court's view, tantamount to conferring taxing power on administrative agencies.

334 A.2d 514 (1975), we noted that there has been an extensive introduction of administrative agencies in State government, as a result of which "there has occurred within these agencies some mingling, blending and overlapping of the legislative, executive and judicial functions." 274 Md. at 220, 334 A.2d 514. Moreover, we said, "This [is] permissible, within limits, as the separation of powers concept may constitutionally encompass a sensible degree of elasticity and should not be applied with doctrinaire rigor." *Id. See also* R. Oppenheimer, *Administrative Law in Maryland*, 2 Md.L.Rev. 185, 188 (1938). In view of our case law on the delegation doctrine, we find no substance in appellees' argument that Article 8 of the Declaration of Rights requires a much stricter application of the separation of powers doctrine than is applied in cases arising under the federal constitution.

## V

We hold that the lower court was in error in invalidating the VEIP legislation involved in this case. That the delegation of authority to the MVA and the Department of Health and Mental Hygiene was legislatively directed and channeled to effectuate compliance with the Federal Clean Air Act in the development and implementation of a motor vehicle emissions inspection program is clear beyond question. Sections 23–202 and 23–207 are tied to the federal statute and quite plainly incorporate the federal goal of attainment of the requisite air quality standards. Section 23–202 requires a VEIP "to the extent required by federal law." Section 23–207 requires the adoption of agency rules and regulations consistent with federal law for the purpose of "implementation, administration, regulation and enforcement" of the VEIP statute, including rules establishing vehicle emission standards and exempting certain vehicles from inspection.

Manifestly, the Legislature made the fundamental policy decision to conform state with federal law and thus

maintain the State's eligibility for federal highway and sewage treatment plant grants. *Armacost I, supra,* 299 Md. at 402, 474 A.2d 191. Also clear from that case is that the VEIP is a measure designed to protect the public health and the widest latitude must be given in such circumstances to delegations of legislative authority to administrative agencies. 299 Md. at 400, 474 A.2d 191. That the VEIP legislation did not specify what persons, vehicles and geographic areas would be included within the program does not, considering all the circumstances, compel a finding that the delegation of legislative authority was too broad to withstand constitutional attack. Under the Federal Clean Air Act, the EPA Administrator was required to promptly disseminate to appropriate state agencies information "regarding processes, procedures and methods to reduce or control [air pollutants]" involved in the motor vehicle emission inspection and maintenance programs. 42 U.S.C. § 7408(f)(1)(A)(i). Ample guidance in extraordinary detail was provided under the federal law to the states in establishing their vehicle emission inspection programs.[14] Neither the MVA nor the Department of Health and Mental Hygiene was left without guidance in establishing and

---

**14.** EPA first met the statutory requirement by publishing in February 1978 an *Information Document on Automobile emissions Inspection and Maintenance Programs* (reprinted in 43 Fed.Reg. 21673 (1978)). Subsequently, EPA's VEIP policy was set forth in more detail in a July 17, 1978 internal memorandum from David Hawkins, Assistant Administrator for Air and Waste Management, to EPA Regional Administrators. The Hawkins Memorandum "indicat[ed] what EPA will consider a minimally acceptable program wherever I/M [inspection/maintenance] is required by the Act." It was widely distributed among the states and contained "EPA's basic requirements for I/M." 46 Fed.Reg. 7182 (1981). The Hawkins memo discussed geographic coverage and contained detailed guidance for achieving the emissions reductions required of an inspection/maintenance program. A later technical report, issued August 1981 and entitled *Discussion of the Selection of Coverage and Frequency Alternatives in Inspection and Maintenance Programs,* outlined EPA's recommendations regarding, *inter alia,* selection of vehicles covered and age exemptions of vehicles.

administering the inspection program required by the federal law.[15]

The Legislature made clear in its enactment of the VEIP that it would review agency rules and regulations and, in effect, sanction their implementation unless legislatively changed—an implicit approval of the substance of the agency's rules and regulations governing the VEIP. Undoubtedly, as expressed in the Preamble to ch. 492 of the Acts of 1982, the breadth of the legislative delegation under the VEIP was to some extent influenced by the Legislature's concern that the federal law provisions would likely be modified on a continuing basis; that it would be impracticable for the General Assembly to act with immediacy in conforming its VEIP legislation to new federal standards; that because federal grant money hinged on compliance with the federal law, the Legislature did not intend to risk loss of these funds by waiting until legislation could be enacted at the next legislative session; and hence substantial reason existed for such delegation of authority to the administrative agencies to maintain a VEIP "to the extent required by federal law." That there were numerous changes made by the Legislature in laws enacted subsequent to the original 1978 enactment also evidences the

---

**15.** Section 2–302(d)(1) of the Health–Environmental Article of the Code (1982 Repl.Vol.) concerns emissions standards.

"[I]f national ambient air quality standards are attained in an air quality control area, the Department [of Health and Mental Hygiene] shall set emission standards for that area based on the goal of achieving emission levels that are not more restrictive than necessary to attain and maintain the ambient air quality standards in that area."

Section 2–302(c) mandates that the Department

"shall set ambient air quality standards for pollutants that are identical to the standards for pollutants for which national primary or secondary ambient air quality standards have been set by the federal government."

The limitations of subsection 1 do not apply if a political subdivision requests a more restrictive standard or if

"[n]ew source performance standards, national prevention of significant deterioration requirements, national emission standards for hazardous pollutants, or any other requirements of the federal Clean Air Act apply." § 2–302(d)(2)(i), (ii).

close and continuous legislative monitoring of its VEIP legislation and of agency action.

Applicable to this case is our statement in *Governor v. Exxon Corp., supra,* 279 Md. at 440, 370 A.2d 1102, that "the complexity of modern economic conditions may make it impossible to tailor specific guidelines for every conceivable situation ... [;] latitude in granting discretion [to administrative agencies] is necessary." *See generally South Terminal Corporation v. EPA,* 504 F.2d 646 (1st Cir.1974). In so concluding, we note that it is entirely consistent with both federal and state law that the VEIP legislation, as administratively implemented, applied only to the two nonattainment regions of the State, one of which encompassed Carroll County.

JUDGMENT REVERSED; CASE REMANDED TO THE CIRCUIT COURT FOR CARROLL COUNTY FOR ENTRY OF A DECLARATORY JUDGMENT CONSISTENT WITH THIS OPINION; COSTS TO BE PAID BY APPELLEES.