627 A.2d 1039

Joyce JUDY et al.

v.

William Donald SCHAEFER et al.

No. 138, Sept. Term, 1992.

Court of Appeals of Maryland.

July 22, 1993.

240

J. Peter Sabonis, argued and on brief (Marylee Hannan, Leslie K. Dick and Charles J. Morton, Jr., Kollman & Sheehan and Susan Goering, American Civ. Liberties Union on brief), Baltimore, for petitioner.

Evelyn O. Cannon, Asst. Atty. Gen., argued and on brief (J. Joseph Curran, Jr., Atty. Gen. of Maryland, Maureen M. Dove, Cecilia Januszkiewicz, and Steven D. Keller, Asst. Attys. Gen., on brief), Baltimore, for appellee.

Amicus Curiae for appellant Joyce Judy, et al.

James A. Mayhew, John C. Eidleman, Legal Aid Bureau, Inc., of Towson, for Linda Powell and Tony Cage.

Argued before ELDRIDGE, RODOWSKY, McAULIFFE, CHASANOW, KARWACKI and ROBERT M. BELL, JJ., and CHARLES E. ORTH, Jr., Judge of the Court of Appeals (Retired, Specially Assigned).

ELDRIDGE, Judge.

The petitioners in this case are indigent individuals representing themselves and certified classes of recipients of General Public Assistance, Aid to Families with Dependent Children, and Medical Assistance State Only. They challenge the validity of the Governor's action reducing appropriations pursuant to Maryland Code (1985, 1988 Repl.Vol.), § 7–213 of the State Finance and Procurement Article.

Section 7–213 of the State Finance and Procurement Article authorizes the Governor, with the approval of the Board of Public Works, to reduce, by not more than 25%, any appropriation that the Governor deems unnecessary.[1]  Pursuant to

---

1. Maryland Code (1985, 1988 Repl.Vol.), § 7–213 of the State Finance and Procurement Article reads in its entirety as follows:
   **"Reductions.**
   (a) *Authorized.*—Except as provided in subsection (b) of this section, with the approval of the Board of Public Works, the Governor may reduce, by not more than 25%, any appropriation that the Governor considers unnecessary.

§ 7–213, on September 30, 1992, the Governor submitted a plan for the reduction of many appropriations for Fiscal Year (FY) 1993 to the Board of Public Works for approval. A reduction of $30.8 million appropriated to the Department of Health and Mental Hygiene (DHMH) and a reduction of approximately $20 million appropriated to the Department of Human Resources (DHR) were proposed. The $30.8 million DHMH reduction represented the elimination of health care coverage under the grant for Medical Assistance State Only. The $20 million DHR cut resulted from reducing grants to disabled indigents in the General Public Assistance program and from reducing assistance to families under the Aid to Families with Dependent Children program. The Board of Public Works approved the Governor's proposed reductions with amendments not relevant to this case. Thereafter, pursuant to an order signed by the Governor, the Comptroller adjusted the accounts of all state agencies to reflect the reduced appropriations.[2]

---

(b) *Exclusions.*—(1) The Governor may not reduce an appropriation to the Legislative Branch or the Judicial Branch of the State government.

(2) The Governor may not reduce an appropriation for:

(i) payment of the principal of or interest on the State debt;

(ii) public schools; or

(iii) the salary of a public officer, during the term of office.

(3) Except as provided in the Merit System Law, the Governor may not reduce an appropriation for the salary of an employee in the classified or unclassified service."

**2.** Pursuant to Maryland Code (1984), § 10–101 *et seq.* of the State Government Article, each of the agencies implemented the changes through regulations. DHR's Secretary submitted regulations to the Administrative Executive and Legislative Review committee for approval on October 30, 1992. These regulations were designed to change the public assistance levels in accordance with the Governor's order. The Secretary requested that the approved regulations be made retroactive to November 1, 1992. DHR implemented the reduction on November 1, 1992. The regulations were approved on November 24, 1992, and were made effective November 25, 1992.

DHMH's Secretary also submitted regulations to the Administrative and Legislative Review committee for approval on October 30, 1992. The regulations were approved on November 24, 1992, and given an effective date of December 1, 1992. DHMH did not implement the reduction until December 1, 1992.

On November 2, 1992, the petitioners filed in the Circuit Court for Baltimore City a complaint seeking to enjoin the Governor, the Treasurer, the Comptroller, the Secretary of the Department of Human Resources and the Secretary of the Department of Health and Mental Hygiene from reducing their public assistance benefits and from eliminating their medical coverage. On November 16, 1992, the circuit court issued an interlocutory injunction preventing these officials from implementing the challenged reductions. On November 18, 1992, in response to a petition by the State, the Court of Special Appeals stayed the circuit court's interlocutory order.

Thereafter, the parties filed in the circuit court cross motions for summary judgment. The plaintiffs argued, *inter alia,* that § 7–213 was inconsistent with Art. III, § 52, of the Maryland Constitution and was thereby unauthorized. They further argued that the General Assembly's grant of authority to the Governor to reduce appropriations under § 7–213 violated the principle of separation of powers set forth in Art. 8 of the Maryland Declaration of Rights because it failed to set forth sufficient standards to guide the Governor's discretion.[3] The plaintiffs contended that the Governor's action in reducing these appropriations and the Board of Public Works's action in approving them was arbitrary, capricious and unsupported by substantial evidence. Finally, the plaintiffs claimed that the 25% limitation on reductions under § 7–213 was violated when the sum appropriated to DHMH was reduced by eliminating the Medical Assistance State Only grant.

The State contended that § 7–213 did not violate the principle of separation of powers and was consistent with Art. III, § 52, of the Maryland Constitution. It further asserted that action of the Governor and the Board of Public Works pursuant to § 7–213 was not judicially reviewable for arbitrariness,

---

3. Article 8 of the Declaration of Rights provides:
"That the Legislative, Executive and Judicial powers of Government ought to be forever separate and distinct from each other; and no person exercising the functions of one of said Departments shall assume or discharge the duties of any other."

capriciousness or lack of evidentiary support. The State also argued that the elimination of the Medical Assistance State Only grant did not violate the terms of § 7–213.

On December 2, 1992, the circuit court granted the State's motion for summary judgment and denied that of the plaintiffs. The trial court expressed the reasons for his action as follows:

> "It is my conclusion from the undisputed facts in evidence that the Governor's action and that of . . . the Board of Public Works, on September 30th was lawful and constitutional. I believe that the Governor and the Board of Public Works took the actions that they did on September 30th pursuant to Section 7–213, and I believe that Section 7–213 was constitutionally enacted pursuant to the provisions of Article III, Section 52, Subsection 13 of the Maryland Constitution.

> "I also believe that not only did the Governor act pursuant to that statute which I find to be lawful and constitutional, but I find that he exercised the authority and powers vested in him under that statute properly and in accordance with the law.

> \*    \*    \*    \*    \*    \*

> "I do not think there has been any violence done in these enactments to the separation of powers of the State of Maryland. . . .  I think that the total picture that emerges from our constitution is, as the defendants suggest, a very strong and powerful Governor, particularly when it comes to budgetary matters. . . .  So I think that our mothers and fathers over the years constructed the type of separation of powers on the state level that vests considerable power and authority to the Governor.

> \*    \*    \*    \*    \*    \*

> "I think we have to look at Section 7–213 in that light and harmonize it with the overall budgetary process that the Maryland Constitution sets forth. To me, the Legislature, with all of this framework in mind, I believe did have the authority to say that in view of our framework, and for a

more orderly government, we believe the Governor should have this power, that is to the peoples' interest that he have this power, and that we not have gridlock. I don't think its surrendering legislative power to the Governor. I think it is the Legislature's intent to further define and expurgate just what the Governor is able to do with a State budget, and reinforces the preeminent role which ... the Governor has in the State of Maryland in the budgetary process."

The plaintiffs noted an appeal to the Court of Special Appeals on December 17, 1992, and then filed in this Court a petition for a writ of certiorari. Prior to argument in the Court of Special Appeals, we issued a writ of certiorari to consider the important issues presented. 329 Md. 168, 617 A.2d 1085.

I.

As the trial court recognized, fundamental to the resolution of this dispute is the nature of Maryland's executive budget system. This Court, on several occasions, has discussed the requirements and history of that system. *See Kelly v. Marylanders for Sports Sanity,* 310 Md. 437, 450–461, 530 A.2d 245, 251–257 (1987); *Bayne v. Secretary of State,* 283 Md. 560, 567–569, 392 A.2d 67, 71–72 (1978); *Md. Act. for Foster Child. v. State,* 279 Md. 133, 140–153, 367 A.2d 491, 495–502 (1977); *Panitz v. Comptroller,* 247 Md. 501, 505–509, 232 A.2d 891, 893–895 (1967); *McKeldin v. Steedman,* 203 Md. 89, 96–103, 98 A.2d 561, 563–567 (1953); *Dorsey v. Petrott,* 178 Md. 230, 241–244, 13 A.2d 630, 636–647 (1940); *Baltimore v. O'Conor,* 147 Md. 639, 644–646, 128 A. 759, 761, 40 A.L.R. 1058 (1925). We have not, however, dealt with the authority of the Governor to reduce an appropriation after the budget bill has passed.

In 1916, in response to fiscal irresponsibility which led to deficits, the voters of the State of Maryland ratified an amendment to the Constitution which established an executive budget system, Art. III, § 52, of the Maryland Constitution. *See Md. Act. for Foster Child. v. State, supra,* 279 Md. at 145, 367 A.2d at 497–498; *McKeldin v. Steedman, supra,* 203 Md. at 96, 98 A.2d at 564; Goodnow Commission Report, *Journal*

*of Proceedings of the Senate of Maryland,* for the Legislative Session of 1916, at 129–134 ("Goodnow Commission Report"); Hooper S. Miles, *The Maryland Executive Budget System and a Review of its Administration,* 1916–1941, at 7–8 (1942) ("Miles"). The amendment had been proposed by the "Commission on Economy and Efficiency on the Budget System" [4] and was designed "to bring about a fundamental change in State appropriations" by vesting in the Governor responsibility for the fiscal affairs of the State. *Md. Act. for Foster Child. v. State, supra,* 279 Md. at 145; 367 A.2d at 498. The driving force behind the implementation of a budget system in which the executive plays a dominant role was the desire to avoid further deficits and to ensure a balanced budget. In order to fully understand the context of the constitutional arguments raised in this case, a description of the budgetary process under § 52 is appropriate.

There have been some changes to the budget amendment since 1916. Currently, the system functions as follows. Ordinarily, on the third Wednesday in January, the Governor submits to the General Assembly a comprehensive budget and a budget bill for the ensuing fiscal year, Art. III, § 52(3). [5] In

---

4. The Commission was also known as the "Goodnow Commission" after its chairman, Dr. Frank J. Goodnow, President of Johns Hopkins University.

5. Article III, § 52(3), provides:

"On the third Wednesday in January in each year, (except in the case of a newly elected Governor, and then not later than ten days after the convening of the General Assembly), unless such time shall be extended by the General Assembly, the Governor shall submit to the General Assembly a Budget for the next ensuing fiscal year. Each Budget shall contain a complete plan of proposed expenditures and estimated revenues for said fiscal year and shall show the estimated surplus or deficit of revenues at the end of the preceding fiscal year. Accompanying each Budget shall be a statement showing: (a) the revenues and expenditures for the preceding fiscal year; (b) the current assets, liabilities, reserves and surplus or deficit of the State; (c) the debts and funds of the State; (d) an estimate of the State's financial condition as of the beginning and end of the preceding fiscal year; (e) any explanation the Governor may desire to make as to the important features of the Budget and any suggestions as to methods for reduction or increase of the State's revenue."

this budget, the Governor estimates the State's revenues and establishes the fiscal priorities of the State by setting forth a complete plan of proposed expenditures. *Ibid.* The authority to revise estimates received from State agencies and to propose expenditures was granted solely to the Governor in order to establish responsible executive control over budgetary matters.[6] The Goodnow Commission Report discussed the reasoning of the Commission for the concentration of both power over and responsibility for the budget in the Governor, stating (Goodnow Commission Report, *supra,* at 131):

"It will also be noted that the party platform providing for the Commission limited its choice in determining the responsibility for making the final estimates for submission to the Legislature, to the Board of Public Works on the one hand, and to the Governor on the other. We have concluded that this responsibility should be placed on the Governor. We have felt that to make use of the Board of Public Works as a Budget Commission would have the disadvantage of dissipating personal responsibility for financial propositions, and would also run the risk of not securing party responsibility."

Thus, neither the General Assembly nor the Board of Public Works has the authority, in the initial budget process, to

---

**6.** One member of the Goodnow Commission discussed the need for an executive responsible for the budget of the State as follows (William Milnes Maloy, "Human Interest Side of the Budget Question," *The Sun,* Sept. 18, 1916, p. 6):

"The Governor, as the officer who does represent and understand the entire State, and is accountable to all the people, should be charged with the task of framing financial policies, determining the avenues of State expenditure, and especially so as he has to carry out the provisions of the enacted measures. The wholesome check upon this power is that the Legislature must approve the plans, policies and recommendations of the Governor.

  *  *  *  *  *  *

"The proposed amendment gives the Governor the power before, instead of after, action by the Legislature, and locates without possibility of evasion, the responsibility for devising the fiscal arrangements of the State, which responsibility now is distributed among 129 men, each politically accountable only to the voters of a single county or district."

propose an expenditure. Only the Governor may propose an expenditure in the initial budget. Upon receipt of the Governor's proposed budget and budget bill, the presiding officer of each House must introduce the bill. Art. III, § 52(5).[7] Thereafter, the Governor may amend or supplement the budget bill by revising, adding or eliminating any appropriation. *Ibid.*

The General Assembly is authorized to amend the Governor's budget bill under certain circumstances. The General Assembly may not amend the bill in such a way as to affect the obligations of the State under Art. III, § 34, of the Maryland Constitution, or to affect the public schools or the salaries required by the Constitution to be paid. It may increase or reduce the items in the Governor's budget relating to the General Assembly and the Judiciary. It may reduce but not increase all other items in the Governor's budget. Art. III, § 52(6).[8] When both houses of the General Assembly

---

7. Article III, § 52(5), provides:

"(5) The Governor shall deliver to the presiding officer of each House the Budget and a bill for all the proposed appropriations of the Budget classified and in such form and detail as he shall determine or as may be prescribed by law; and the presiding officer of each House shall promptly cause said bill to be introduced therein, and such bill shall be known as the 'Budget Bill.' The Governor may, with the consent of the General Assembly, before final action thereon by the General Assembly, amend or supplement said Budget to correct an oversight, provide funds contingent on passage of pending legislation or, in case of an emergency, by delivering such an amendment or supplement to the presiding officers of both Houses; and such amendment or supplement shall thereby become a part of said Budget Bill as an addition to the items of said bill or as a modification of or a substitute for any item of said bill such amendment or supplement may affect."

8. Article III, § 52(6), provides:

"(6) The General Assembly shall not amend the Budget Bill so as to affect either the obligations of the State under Section 34 of Article III of the Constitution, or the provisions made by the laws of the State for the establishment and maintenance of a system of public schools or the payment of any salaries required to be paid by the State of Maryland by the Constitution thereof; and the General Assembly may amend the Bill by increasing or diminishing the items therein relating to the General Assembly, and by increasing or dimin-

pass the budget bill, it becomes law without further action by the Governor. *Ibid.*

These limitations were seen as essential to the task of devising a system that would avoid the accumulation of a deficit and ensure that the Governor's plan of proposed expenditures could not be amended in such a way as to exceed estimated revenues. Article III, § 52(5a), expressly mandates that the Governor propose and maintain a balanced budget.[9] The Goodnow Commission Report, *supra*, at 129–130, states:

> "It will be noted that the [Democratic Party] platform provides for a budget system prepared by the Governor or the Board of Public Works, the items of which can be reduced or eliminated, but not increased, by the Legislature.

> "This limitation is fundamental in our judgment for a sound budget system."

Although the broad authority of the Governor was essential and virtually unanimously supported, the Goodnow Commission grappled with what it described as "the most difficult problem in connection with the formulation of a budget plan, . . . the determination of the powers of the Legislature rela-

---

ishing the items therein related to the judiciary, but except as hereinbefore specified, may not alter the said bill except to strike out or reduce items therein, provided, however, that the salary or compensation of any public officer shall not be decreased during his term of office; and such bill, when and as passed by both Houses, shall be a law immediately without further action by the Governor."

9. Article III, § 52(5a), provides:

"(5a) The Budget and the Budget Bill as submitted by the Governor to the General Assembly shall have a figure for the total of all proposed appropriations and a figure for the total of all estimated revenues available to pay the appropriations, and the figure for total proposed appropriations shall not exceed the figure for total estimated revenues. Neither the Governor in submitting an amendment or supplement to the Budget Bill nor the General Assembly in amending the Budget Bill shall thereby cause the figure for total proposed appropriations to exceed the figure for total estimated revenues, including any revisions, and in the Budget Bill as enacted the figure for total estimated revenues always shall be equal to or exceed the figure for total appropriations."

tive to the estimates to be submitted by the Governor." Goodnow Commission Report, *supra*, at 131. To address this concern the Commission proposed that the Legislature be given "the power to initiate appropriations for objects for which the Governor has made no estimates" but that that power be restricted so that it could not be used "in such a manner as to produce a deficit in the State's finances." *Ibid.* Accordingly, the Goodnow Commission proposed a method whereby, after the budget bill has passed, the General Assembly may consider other appropriations in the form of supplementary appropriation bills. Art. III, § 52(8).[10] These supplementary appropriation bills originate in the General Assembly. Each must address a single work, object or purpose and must contain a tax provision to provide the revenue necessary to pay the appropriation. *Ibid.* The supplementary appropriation bills are presented to the Governor for his signature as any other bill.

In this manner the Governor and the General Assembly together, with the Governor having a preeminent role, enact a budget for the ensuing fiscal year based on departmental estimates of needs and on estimated revenues. The fiscal year begins on July 1 of a calendar year and ends on June 30 of the next calendar year, § 2–101 of the State Finance and

---

10. Article III, § 52(8), provides:

"(8) Supplementary Appropriation Bill. Either House may consider other appropriations but both Houses shall not finally act upon such appropriations until after the Budget Bill has been finally acted upon by both Houses, and no such other appropriation shall be valid except in accordance with the provisions following: (a) Every such appropriation shall be embodied in a separate bill limited to some single work, object or purpose therein stated and called herein a Supplementary Appropriation Bill; (b) Each Supplementary Appropriation Bill shall provide the revenue necessary to pay the appropriation thereby made with a tax, direct or indirect, to be levied and collected as shall be directed in said bill; (c) No Supplementary Appropriation Bill shall become a law unless it is passed in each House by a vote of a majority of the whole number of the members elected, and the yeas and nays recorded on its final passage; (d) Each Supplementary Appropriation Bill shall be presented to the Governor of the State as provided in Section 17 of Article 2 of the Constitution and thereafter all the provisions of said section shall apply."

Procurement Article. Thus, there is a substantial period of time between the submission of revenue estimates and the expiration of the fiscal year. During part of this time the General Assembly is not in session.[11] Given the complex and changing needs of the State over the course of a year, a system was needed to administer the budget.[12]

Article III, § 52(13), of the Constitution provides that "[t]he General Assembly may, from time to time, enact such laws not inconsistent with this section, as may be necessary and proper to carry out its provisions." In the first budget bill passed under Art. III, § 52, the General Assembly began to enact a statutory scheme for the administration of the budget.[13] Until 1939, this statutory scheme was reenacted bi-annually as part of the budget bill.[14] Consistent with the constitutional provi-

---

11. Ordinarily, the Legislative Session begins on the second Wednesday of January and continues for a period of not longer than ninety days. Art. III, §§ 14 and 15, of the Maryland Constitution.

12. *See* Commission on Administrative Organization of the State, *First Interim Report: The Maryland Budget System*, at 8 (1951) ("There is a maximum period of about twenty-two months between the submission of departmental estimates and the expiration of the fiscal year in which the money is spent. In a rapidly changing world no official can accurately measure the exact and detailed needs of his department that far ahead. Much of his guesswork on details is futile and legislative review thereof is likewise futile. Whatever the figures used, sound administration will require that they be changed by budget amendment according to changed conditions when the spending time comes").

13. Most budget bills enacted by the General Assembly provide that the appropriations therein are "subject to the Public General Laws of Maryland relating to the Budget procedure." *See, e.g.,* Ch. 64, § 1, of the Acts of 1992.

14. Prior to 1949, the General Assembly met bi-annually. By Ch. 497 of the Acts of 1947, ratified by the voters on November 2, 1948, Art. III, §§ 14, 15 and 52, of the Maryland Constitution were amended to require the General Assembly to meet for 90 days on odd years and for 30 days on even years. The 30–day session was ordinarily limited to "[b]ills having to do with budgetary, revenue and financial matters of the State Government ..." In 1964, by Ch. 161 of the Acts of 1964, ratified by the voters on November 2, 1964, the Constitution was again amended to provide that the General Assembly meet for full sessions annually.

sions, the bulk of the responsibility for the fiscal affairs of the State during the fiscal year was vested by this statutory scheme in the Governor.

The first budget bill passed after the ratification of the budget amendment to the Maryland Constitution provided (Ch. 206 of the Acts of 1918, § 3):

"That the items and amounts which hereinafter follow the sums appropriated, and which are, respectively, entitled 'Schedule,' do not constitute appropriations but represent the initial plan of distribution and apportionment of the appropriations to which they, respectively, refer. Each appropriation shall be paid out only in accordance with the Schedule therefor, if any, unless such Schedule be amended in the following manner: Any department, board, commissioner or officer may at any time submit in writing to the Governor an amended Schedule for the distribution and apportionment of the appropriations made to it or him, or any unexpended balance thereof, different from the manner set forth in the Schedule contained in this Act. The Governor may himself make such an amended Schedule, if the same be necessary, with respect to the appropriations for the Executive Department. If the Governor shall make such an amended Schedule with respect to the appropriations for the executive Department or if he shall approve an amended Schedule when submitted to him as aforesaid, then he shall transmit the same with his certificate of approval to the Comptroller, and thereafter the appropriation, or the unexpended balance thereof, shall be paid out in accordance with such amended Schedule. Any amended Schedule, so submitted to the Governor may be withdrawn and amended to meet any objections of the Governor, and then resubmitted. Any such amended Schedule may be again amended, at any time, in like manner and with like effect. All amendments in Schedules thus made or approved by the Governor shall be reported by him to the next session of the General Assembly."

Thus, the concept of the budget bill being an "initial plan of disbursement" has been an element of the executive budget

system since its enactment. As Judge Alan M. Wilner, now Chief Judge of the Court of Special Appeals, explained in his book *The Maryland Board of Public Works: A History*, at 85 n. 20 (1984),

"This authority [to reduce an appropriation deemed unnecessary by 25%] was in addition to the even more comprehensive control delegated to the governor. In the 1931 budget (Acts of 1931, ch. 150), the General Assembly had stated that the items enumerated in the bill constituted only an 'initial plan of disbursement' and that the governor could, if he chose, amend that schedule with respect to executive agencies. Sec. 7 of the 1933 budget retained the concept of 'initial plan of disbursement,' but in contrast to its predecessors it *required* all executive agencies to submit to the governor an amended itemized schedule and permitted disbursement only to the extent the governor approved the amended schedule. This, in effect, made the budget bill a mere starting point and gave the governor total control over the state budget..."

In the 1920 Budget Bill, the General Assembly added that the Legislature "may by resolution provide for or authorize the amendment of its schedule." Ch. 487 of the Acts of 1920, § 7.[15] Similar provisions for the administration of the budget were passed as part of every budget bill from the inception of

---

**15.** In 1920, the Hon. Millard F. Tydings, then Speaker of the House of Delegates, requested an opinion from the Attorney General as to whether the Speaker could vary the number of House employees, by increasing some and decreasing others, if, in the aggregate, he remained within the total appropriation for this purpose. 5 Att'y Gen. Ops. 208 (1920). The Attorney General, Alexander Armstrong, responded that if there had been a legislative provision for the readjustment of an appropriation to the Senate or the House of Delegates, a revision of the schedule for various items in the appropriation would be proper. Because there was no such statutory provision, the Attorney General advised Mr. Tydings that "no such power now exists." *Id.*, at 209. He further advised, that "[t]he only method by which such a provision can be made is by legislative action concurred in by both the Senate and the House of Delegates." *Id.*, at 210.

Such a provision was enacted that year in the Budget Bill, Ch. 487 of the Acts of 1920.

the budget system to their codification in 1939 as "the Budget and Procurement Act." *See* Ch. 206 of the Acts of 1918; Ch. 487 of the Acts of 1920; Ch. 500 of the Acts of 1922; Ch. 176 of the Acts of 1924; Ch. 654 of the Acts of 1927; Ch. 134 of the Acts of 1929; Ch. 150 of the Acts of 1931; Ch. 597 of the Acts of 1933; Ch. 92 of the Acts of 1935; Ch. 515 of the Acts of 1937.

An additional measure for the administration of the budget was included in Ch. 597 of the Acts of 1933 and Ch. 92 of the Acts of 1935, as the General Assembly attempted to deal with "the devastating effects of the economic depression." Miles, *supra*, at 28. In the period prior to the 1935 legislative session, the State Treasury faced the first deficit since the establishment of the executive budget system. Miles, *supra*, at 29–30. On January 2, 1935, Governor Ritchie addressed the General Assembly, stating (Miles, *supra*, at 31):

> " 'In this State the estimates of revenues and disbursements for Budget purposes must be prepared more than two and a half years before the close of the two-year budgetary period.' 'At best this is a difficult thing to do' and the effects of the economic depression began 'within the past year or more' to be reflected in a decline in State revenues."

In order to allow for greater flexibility between legislative sessions for the administration of the budget, especially in times when the State's revenues had been greatly overestimated in the budget bill, the General Assembly enacted as § 11 of the Budget Bills of 1933 and 1935, the following provision:

> "*And be it further enacted*, That the Board of Public Works is hereby authorized and empowered to supervise the expenditure of all appropriations contained in this budget and for that purpose the said Board shall have power to reduce or eliminate any appropriation which it may deem unnecessary, except the appropriation for the payment of interest and the retirement of the State debt and the appropriation to the Legislature and the judiciary and no officer, department, commission or employee shall be authorized to expend

any appropriation or part of an appropriation which the Board of Public Works deems to be unnecessary. The said Board shall have full power and authority to establish rules and regulations, not inconsistent with law, to carry out the powers conferred by this section."

By Ch. 64 of the Acts of 1939 the General Assembly enacted Article 15A of the Maryland Code, entitled "Budget and Procurement Act." In addition to codifying the sections passed in previous budget bills, the Act also recast the above-quoted § 11 of the 1933 and 1935 Budget Bills. The new language was described by then Treasurer of Maryland, Hooper S. Miles, as follows (Miles, *supra,* at 66–67, 79):

"Before adjourning *sine die* on April 3, 1939, the Legislature passed another Administration Bill, known as the 'Budget and Procurement Bill' .... Under the Act, the Governor now may, with the approval of the Board of Public Works, impound up to 25% 'of any item of appropriation which he may deem unnecessary except appropriations for the payment of interest and the retirement of the State debt and appropriation to the Legislature, the Public Schools and the Judiciary.' ...

The Act also strengthened and broadened the authority of the Board of Public Works in exercising control over the fiscal practices and related administrative policies of the departments, institutions and agencies of the State.

\*   \*   \*   \*   \*   \*

"The adoption of the 'Budget and Procurement Act' by the Legislature of 1939 constituted not only a noteworthy step forward in support of the Budget System, but *should* mark the beginning of a more effective and enlightened administration of the Budget System and the fiscal affairs of the State than at any time in the past."

Most of this "Budget and Procurement Act" is currently codified as Division I, State Finance, of the State Finance and Procurement Article. Title seven of Division I deals with appropriations and subtitle two of title seven addresses the distribution of appropriations by the executive branch of the

State government. These sections provide that "[m]oney may be disbursed from the State Treasury only in accordance with the current appropriation for a program as amended from time to time in accordance with this title," § 7–205 of the State Finance and Procurement Article.[16] Thus, while the "initial appropriation for a program is set forth in the appropriation act ... the appropriation for a program may be increased or reduced as provided in this subtitle." § 7–206 of the State Finance and Procurement Article.

The subtitle goes on to describe various amendments which can be made during the fiscal year. Section § 7–208 provides that when the General Assembly is not in session, "the President of the Senate and the Speaker of the House of Delegates jointly may authorize an amendment of an appropriation for a program of the Legislative Branch of the State Government." Likewise, § 7–208.1 provides that the "Chief Judge of the Court of Appeals may authorize an amendment of an appropriation for a program of the Judicial Branch." In either case, the amendment "may not increase the sum of the appropriations for all the programs" of the Legislative or Judicial Branches respectively. §§ 7–208(c) and 7–208.1(b).

Sections 7–209 and 7–213 detail the Governor's authority to change the amounts appropriated. The Governor may alter an appropriation for a program of the Office of the Governor, § 7–209(a). Whenever an officer or unit of the Executive Branch of the State Government requests a change in an appropriation, the Governor may approve the change, § 7–209(b).[17] Such an amendment "may not increase the sum of the appropriations for all the programs of the officer or unit," § 7–209(c). The Governor also may amend an appropriation

---

**16.** Although both the statutory language and the supporting documents refer to changes in appropriations as "budget amendments," such orders do not purport to amend the enacted budget bill. Rather, such orders alter the distribution of the appropriations.

**17.** There are several Attorney General Opinions discussing the authority of the Executive to amend an appropriation under this section. *See* 71 Att'y Gen. Ops. 3 (1986); 46 Att'y Gen. Ops. 13 (1961); 34 Att'y Gen. Ops. 105 (1949); 3 Att'y Gen. Ops. 121 (1918).

by reducing, by not more than 25%, any appropriation which he deems to be unnecessary, § 7–213. The Governor may not, under this provision, reduce an appropriation for the Legislative or Judicial Branches, for the payment of principal of or interest on the state debt, for the public schools, for the salary of a public officer during the term of office, or for the salary of an employee in the classified or unclassified service, except as provided in the Merit System Law. § 7–213(b).

Each one of the above-described amendments to appropriations is subject to the restriction that it "may not change any language or substantive provision in the State budget," § 7–210(a). The post-legislative "budget amendment" process applies primarily to the "monetary figures of an appropriation," § 7–210(b).

This comprehensive scheme for an executive budget system, including the administration by the executive of appropriations, has, as its main objective, the maintenance of a balanced budget as required by Art. III, § 52(5a), of the Maryland Constitution. *See McKeldin v. Steedman, supra,* 203 Md. at 98, 98 A.2d at 564 ("The constitutional objective ... [is] to prevent the possible disturbance of the balanced budget which the plan contemplated").

## II.

The plaintiffs present several challenges to the action of the Governor and the Board of Public Works in this case. They argue that § 7–213 is inconsistent with Art. III, § 52, and thus is unauthorized. In addition, they contend that the statute violates the principle of separation of powers set forth in Art. 8 of the Maryland Declaration of Rights because it constitutes a delegation of legislative power to the Chief Executive and lacks sufficient standards to guide the Governor's exercise of authority. If this Court determines that § 7–213 is consistent with § 52 and does not violate the principle of separation of powers, then the plaintiffs urge this Court to overturn the action of the Governor and Board on the ground that it was arbitrary, capricious or unsupported by substantial evidence.

Finally, the plaintiffs maintain that the action with respect to the Medical Assistance State Only grant did not comply with the 25% limitation in § 7–213.

## A.

As the summary in Part I of the requirements and history of the executive budget system demonstrates, the budget system as it has evolved in Maryland imposes the power over and the responsibility for the fiscal affairs of the State primarily in the Governor. Article III, § 52(13), authorizes the General Assembly to enact statutes which are "not inconsistent" with the constitutional budget process and which are "necessary and proper" for the process to function.

The statutes providing for the administration of the budget process, including § 7–213, were enacted in accordance with § 52(13) of Art. III. The budget bills beginning with 1918 acknowledged that, given the dynamic economic needs of the State, flexibility in the distribution of appropriations was needed. *See, e.g.,* Ch. 206 of the Acts of 1918 ("the items and amounts which hereinafter follow the sums appropriated ... do not constitute appropriations, but represent the initial plan of distribution and apportionment of the appropriations"); Commission on Administrative Organization of the State, *First Interim Report: The Maryland Budget System,* at 8 (1951) ("Whatever the figures used, [in the budget bill,] sound administration will require that they be changed by budget amendment *according to changed conditions when the spending time comes*"). The enactment of § 7–213 "constituted not only a noteworthy step forward in support of the Budget System, but [also] mark[ed] the beginning of a more effective and enlightened administration of the Budget System and the fiscal affairs of the State." Miles, *supra,* at 79.

The plaintiffs' contend that § 7–213 is inconsistent with Art. III, § 52, because it allows the Governor to reduce appropriations. According to the plaintiffs, the authority to reduce appropriations was assigned solely to the General Assembly by Art. III, § 52. In apparent disregard of the

Governor's major role in every aspect of the budgetary process, the plaintiffs state (brief at 7):

"The power to amend legislation and the power to reduce appropriations are ... functions committed solely to the legislative branch under our state constitution."

This is simply an inaccurate statement. Section 52 of Art. III allows the Governor to revise departmental estimates and, in the event that departmental requests exceed estimated revenues, § 52(5a) mandates that the Governor reduce those departmental estimates. *Md. Act. for Foster Child. v. State, supra,* 279 Md. at 151, 367 A.2d at 501 ("[T]he Constitution itself gives the Governor authority to reduce estimated appropriations in all categories except those for the General Assembly, for the Judiciary and for the public schools as provided by law"). In addition, the Constitution expressly provides that the Governor may amend or supplement the budget bill, Art. III, § 52(5).

The authority given to the Governor in § 7–213 corresponds to the power vested in the Governor by Art. III, § 52. Section 7–213 merely allows the Governor to accomplish at the end of the budget process what he is required to do when he submits his initial budget. If the revenue estimates for FY 1993 had been accurate at the time the budget bill was being prepared for submission to the General Assembly, the Governor would have been required to impose the reductions at that juncture. The revenue estimates for FY 1993 turned out to be inaccurate after the enactment of the budget bill, just as they turned out to be inaccurate in the 1930's. The General Assembly, well aware of the problem in the 1930's and the possibility of its recurrence, enacted § 7–213 in 1939 in order to forestall the accumulation of deficits in subsequent fiscal years.

Section 7–213 comports with Art. III, § 52, because the statute recognizes and perpetuates the preeminent role of the Governor in the budget process, a role considered by the Goodnow Commission to be "fundamental ... for a sound budget system." Goodnow Commission Report, *supra,* at 130.

Furthermore, because § 7–213 furthers the requirement of maintaining a balanced budget throughout the fiscal year, it is precisely the type of legislation which the framers of Art. III, § 52, contemplated.

■ The plaintiffs also contend that the balanced budget requirement was intended to apply only during the preparation of the budget and its passage. This argument is inconsistent with the language and history of Art. III, § 52. The single unifying theme of the move to develop a budget system was to avoid a deficit and to maintain a balanced budget. *See* Goodnow Commission Report, *supra*, at 130–131; Miles, *supra*, at 7–8; *Md. Act. for Foster Child. v. State*, *supra*, 279 Md. at 145, 367 A.2d at 497–498. Every budget bill since 1918 has contained language prohibiting State officials from spending money in excess of their appropriations. *See, e.g.*, Ch. 206 of the Acts of 1918; Ch. 487 of the Acts of 1920; Ch. 500 of the Acts of 1922; Ch. 176 of the Acts of 1924; Ch. 654 of the Acts of 1927; Ch. 134 of the Acts of 1929; Ch. 150 of the Acts of 1931; Ch. 597 of the Acts of 1933; Ch. 92 of the Acts of 1935; Ch. 515 of the Acts of 1937. In times of revenue shortfall, the General Assembly charged the Governor or the Board of Public Works with the unpleasant task of impounding appropriations to prevent a deficit. *See, e.g.*, Ch. 597 of the Acts of 1933; Ch. 92 of the Acts of 1935; Ch. 64 of the Acts of 1939.

Article III, § 52, sets forth a detailed process for the submission of a budget and the passage of a budget bill. It does not address specifically the administration of that budget. Rather, Art. III, § 52(13), allows the General Assembly to enact legislation for the administration of the budget that is consistent with Art. III, § 52. The General Assembly has enacted statutes for the administration of appropriations; executive control over the administration of appropriations during the portion of the year in which the General Assembly is not in session has been part of the executive budget system since 1918.

Thus, the authority of the Governor in § 7–213 mirrors the authority of the Governor in § 52 of Art. III. As the above summary of the history of appropriations in this State demonstrates, flexibility is needed in the administration of the budget in order for the State to run efficiently and to avoid deficits. Therefore, the statute is consistent with Art. III, § 52, and is a "necessary and proper" means of administering the budget and maintaining a balanced budget.

## B.

■ With respect to the constitutional requirement of separation of powers generally, this Court has repeatedly pointed out that Art. 8 of the Maryland Declaration of Rights does not impose "a complete separation between the branches of government," and that delegation of legislative power to the executive branch is constitutionally permissible "where sufficient safeguards are legislatively provided for the guidance ... in ... administration of the statute." *Department of Transportation v. Armacost*, 311 Md. 64, 81, 72, 532 A.2d 1056, 1064, 1060 (1987). *See also Dep't of Nat. Res. v. Linchester*, 274 Md. 211, 218–220, 334 A.2d 514, 520–521 (1975); *County Council v. Investors Funding*, 270 Md. 403, 441–442, 312 A.2d 225, 244–246 (1973); *Baltimore v. State*, 15 Md. 376, 459 (1860).

Moreover, traditional principles of separation of powers were modified by the enactment of Art. III, § 52, of the Maryland Constitution, particularly in light of the preeminent role of the Governor in the budgetary process. *See Mandel v. O'Hara*, 320 Md. 103, 132, 576 A.2d 766, 780 (1990). As Hooper S. Miles stated, (Miles, *supra*, at 9–10):

"The present Budget System, which is technically known as the 'State Executive Budget System,' was designed ... to impose upon the Governor the primary responsibility of controlling the fiscal policies and operations of the State .... The present System, therefore, effectively deprives the Legislature of the almost unlimited power of appropriation that it formerly possessed, and at the same time greatly

enhances the responsibility of the Governor in the conduct of the State's fiscal affairs."

Article III, § 52, allows the Governor to act in a way that would otherwise be considered legislative; the Governor has a major legislative-type role with respect to the budget.[18]  *Cf. Mandel v. O'Hara, supra,* 320 Md. at 121–125, 576 A.2d at 775–777 (Governor's action in vetoing legislation is a legislative act).  The plaintiffs' argument concerning separation of powers must be addressed in the context of the executive budget system created by Art. III, § 52.

The plaintiffs advance the contention that the delegation is improper because authority is vested in the person of the Governor and not an executive branch principal department or administrative agency.  This argument turns the budget process on its head.  The plaintiffs' overall delegation argument might have more merit if the delegation were to anyone but the Governor.  As previously stated, the Governor has a preeminent constitutional role with respect to appropriations.  Concentrating this power and responsibility in the person of the Governor is consistent with the Goodnow Commission's desire to establish a strong executive budget system.  The Goodnow Commission Report, *supra,* at 133–134, states:

"Our thought in drafting the proposed amendment has been:

First—To impose upon the Governor the sole responsibility, within the limits of the Constitution and the provisions of existing law, of presenting to the Legislature a complete and comprehensive statement of the needs and resources of the State ...

Second—To make it impossible for the Legislature so to change the plans proposed by the Governor as to produce a deficit;  but

Third—To permit the Legislature to make provision for any purpose not included in the Governor's plan on the condition

---

18.  In the context of Art. III, § 52, it is not particularly useful to characterize the relationship between the General Assembly and the Governor wrought by § 7–213 as a delegation of legislative authority. Article III, § 52, greatly expanded the gubernatorial role.

that it provide also for the revenue which the accomplishment of its purpose necessitates."

Section 7–213 specifically reflects the Governor's constitutional role with respect to appropriations.

This Court has held that delegations of legislative power ordinarily do not violate the principle of separation of powers when sufficient safeguards are provided. *See, e.g., Department of Transportation v. Armacost, supra,* 311 Md. at 72, 532 A.2d at 1060; *Sullivan v. Bd. of License Comm'rs,* 293 Md. 113, 121, 442 A.2d 558, 563 (1982); *Governor v. Exxon Corp.,* 279 Md. 410, 440–441, 370 A.2d 1102, 1119 (1977), *aff'd,* 437 U.S. 117, 98 S.Ct. 2207, 57 L.Ed.2d 91 (1978); *County Council v. Investors Funding, supra,* 270 Md. at 442, 312 A.2d at 244–246; *Davis v. Montgomery County,* 267 Md. 456, 466–469, 298 A.2d 178 (1972); *McBriety v. Baltimore City,* 219 Md. 223, 238, 148 A.2d 408, 418 (1959); *Givner v. Commissioner of Health,* 207 Md. 184, 191–192, 113 A.2d 899, 902–903 (1955). In some instances the delegation was to an administrative agency, as was the case in *Department of Transportation v. Armacost, supra,* and in some instances the delegation was to an executive officer, as was the case in *Governor v. Exxon Corp., supra,* 279 Md. 410, 370 A.2d 1102 (upholding delegation of legislative authority to the Comptroller).

Moreover, in *Department of Transportation v. Armacost, supra,* we noted that the "trend of the cases . . . 'is toward greater liberality in permitting grants of discretion to [executive branch] officials . . . in order to facilitate the administration of the laws as the complexity of governmental and economic conditions increase.'" 311 Md. at 72, 532 A.2d at 1060, quoting, *County Council v. Investors Funding, supra,* 270 Md. at 442, 312 A.2d at 246. We also acknowledged that we had "relaxed the general rule that a statute vesting discretion in administrative officials without fixing any standards for their guidance is an unconstitutional delegation of legislative power." *Department of Transportation v. Armacost, supra,* 311 Md. at 73–74, 532 A.2d at 1060. *See also Governor v. Exxon Corp., supra,* 279 Md. at 440, 370 A.2d at 1119 ("Ordinarily

when legislative authority is delegated to administrative officials, there must be sufficient standards for the guidance of the administrative officials. However, it has been recognized that the complexity of modern economic conditions may make it impossible to tailor specific guidelines for every conceivable situation and that latitude in granting discretion is necessary").

The General Assembly, in the statutory scheme for the administration of the budget, has provided sufficient safeguards with respect to the Governor's exercise of authority. For example, in order for the Governor to reduce an appropriation under § 7–213, he must obtain the approval of the Board of Public Works.[19] In addition, § 7–210 provides that the Governor may not make any substantive changes to the budget bill pursuant to § 7–213. Furthermore, § 7–213(b) delineates various types of appropriations which the Governor may not reduce. As to the other appropriations, the statute itself provides that the Governor may only reduce items which he deems "unnecessary." Finally, the statute only allows a reduction of 25%. These provisions circumscribe the Governor's exercise of authority while allowing a necessary degree of flexibility.

As previously mentioned, the sufficiency of the safeguards must be considered in light of the constitutional relationship between the Governor and the General Assembly with respect to the budget. In light of the Governor's role in the budgetary process, and the safeguards set forth in the statute, § 7–213 does not violate the principle of separation of powers set forth in Art. 8 of the Maryland Declaration of Rights.

## C.

The plaintiffs, characterizing the Governor's and the Board of Public Works' authority under § 7–213 as "adminis-

---

**19.** We note that the Board of Public Works is composed of the Governor, the Treasurer and the Comptroller. Neither the Treasurer nor the Comptroller are gubernatorial appointees and each is independently elected. The Treasurer is elected by the General Assembly and the Comptroller is directly elected by the voters.

trative," contend that their action pursuant to § 7–213 is subject to normal judicial review and that, in this case, the action should be overturned on the grounds that it is arbitrary, capricious and unsupported by substantial evidence.

In *Dep't of Nat. Res. v. Linchester, supra,* 274 Md. at 224, 334 A.2d at 523, this Court described the types of review that it would undertake of "administrative" actions, stating:

"In those instances where an administrative agency is acting in a manner which may be considered legislative in nature (quasi-legislative), the judiciary's scope of review of that particular action is limited to assessing whether the agency was acting within its legal boundaries. . . . [But] when an agency is acting in a . . . capacity [that is] quasi-judicial . . .[,] the courts review the appealed conclusions by determining whether the contested decision was rendered in an . . . arbitrary, capricious, [or] oppressive . . . manner."

*See also Sugarloaf v. Waste Disposal,* 323 Md. 641, 672–673, 594 A.2d 1115, 1130 (1991) (nonadjudicatory administrative decisions "are not subject to judicial review in the usual sense of that term"). Thus, characterizing the action of the Governor and the Board of Public Works as "administrative" does not subject the action to judicial review on the ground that it is arbitrary or capricious or unsupported by substantial evidence. Rather, the inquiry is whether the action is adjudicatory or quasi-judicial.

As plaintiffs acknowledged in oral argument before this Court, the action by the Governor and the Board of Public Works was not a contested case under the Administrative Procedure Act, Code (1984), § 10–201 *et seq.* of the State Government Article. Furthermore, the action was not the type of administrative determination which has been deemed "adjudicatory" or "quasi-judicial" under our cases. *See Mossburg v. Montgomery County, Md.,* 329 Md. 494, 506, 620 A.2d 886, 892 (1993); *Medical Waste v. Maryland Waste,* 327 Md. 596, 610–611, 612 A.2d 241, 248 (1992); *Sugarloaf v. Waste Disposal, supra,* 323 Md. at 670, 594 A.2d at 1129; *Montgomery County v. Woodward & Lothrop, Inc.,* 280 Md. 686, 711–

713, 376 A.2d 483, 497–498 (1977), *cert. denied,* 434 U.S. 1067, 98 S.Ct. 1245, 55 L.Ed.2d 769 (1978). Consequently, the action is not subject to judicial review to determine whether it was arbitrary, capricious, or unsupported by substantial evidence.

■ The determination of the Governor and Board obviously was quasi-legislative in nature. Our review, consequently, "is limited to assessing whether the [Governor and Board were] acting within [their] legal boundaries." *Dep't of Nat. Res. v. Linchester, supra,* 274 Md. at 224, 334 A.2d at 523. The action was consistent with relevant law. The Governor did not reduce any appropriations which were exempted from reduction under § 7–213(b). The Governor did not make any substantive changes to the Budget Bill, and he only reduced appropriations which he deemed "unnecessary." The reductions were approved by the Board of Public Works. As we shall explain below, the 25% limitation on the reduction of any appropriation was not violated.

### D.

■ The plaintiffs' final argument is that the Governor and the Board of Public Works did not act in accordance with the statutory scheme when they eliminated the Medical Assistance State Only grant. The plaintiffs claim that the 25% limitation was violated.

When Art. III, § 52, was adopted, it required that the Governor submit in the budget an itemized estimate of all appropriations. Art. III, § 52(4). It also required that he submit "the Budget and a bill for all of the proposed appropriations of the Budget classified in such detail as he shall determine or as may be prescribed by law." Art. III, § 52(5). The early budget bills reflected the practice of the Governor to submit a detailed and itemized budget bill. *See, e.g.,* Ch. 487 of the Acts of 1920; Ch. 654 of the Acts of 1927.

In 1951, the Commission on Administrative Organization of the State, also known as the "Soberloff Commission" after the name of its chairman, recommended the implementation of a

"program" budget system. By Ch. 20 of the Acts of 1952, ratified by the voters on November 4, 1952, Art. III, § 52, was amended to allow the Governor greater flexibility in determining the form of the budget bill. Section 52(4) was amended to excise the requirement that the budget estimates submitted by the Governor be "itemized" and to allow the Governor to submit a budget "in such form and detail as the Governor shall determine ..." Ch. 20 of the Acts of 1952 also amended § 52(5) to provided that the Governor may determine the "form and detail" of the budget bill. These changes do not mandate a specific form or level of detail in the budget and budget bill but allow the Governor the flexibility to determine the form and level of detail.

By Ch. 377 of the Acts of 1986, title seven, subtitle two of the State Finance and Procurement Article was amended "[f]or the purpose of conforming the State Finance and Procurement Article to certain constitutional provisions and current State budget practices ..." The changes reflected the current practice, by which the Governor no longer submits itemized appropriations in the budget bill. Rather, budget bills in recent times have reflected "program" level detail. Thus § 7–201 was amended to include the definition of "program" as "a brief statement in an appropriation act of the purpose for which the appropriation shall be used." Also, references to amendments to the "schedule" enacted by the budget bill were replaced with references to amendments of "the current appropriation for a program." *See, e.g.,* § 7–205 ("an appropriation may be disbursed only in accordance with the current schedule" changed to "money may be disbursed ... only in accordance with the current appropriation for a program"); § 7–206 ("the schedule may be amended from time to time as provided in this subtitle" changed to "the appropriation for a program may be increased or reduced as provided in this subtitle"); 7–209(a) ("the Governor may amend the schedule for an appropriation..." changed to "the Governor may amend an appropriation for a program ...").

Prior to 1986, § 7–213(a) provided, in part, that "the Governor may reduce, by not more than 25%, any item of appropria-

tion that the Governor considers unnecessary." The words "item of" were excised by Ch. 377 of the Acts of 1986. Therefore the Governor, pursuant to § 7–213, may reduce by not more than 25% any appropriation he deems unnecessary.

The Budget Bill for FY 1993, Ch. 64 of the Acts of 1992, does not list a sum of money designated for "Medical Assistance State Only." The Budget Bill provides a summary of the total funds appropriated for the "Medical Care Programs Administration," which is under the heading of "Department of Health and Mental Hygiene." Under the subheading of "Medical Care Programs Administration," the FY 1993 Budget Bill breaks down the total sum appropriated to "Medical Care Programs Administration" into the following categories: "Medical Care Operations," "Medical Care Provider Reimbursements," "Medical Care Policy Administration," "Medical Care Compliance Administration," and "Kidney Disease Treatment Services." Each of these categories has a sum of money listed next to it. The Medical Assistance State Only grant is part of the category "Medical Care Provider Reimbursements." The Medical Assistance State Only grant, as well as every other grant in the general category of "Medical Care Provider Reimbursements," are not listed in the Budget Bill, nor is there a sum of money listed for any of these items. Instead, the Budget Bill lists one sum for "Medical Care Provider Reimbursements," and that sum is part of the total appropriation for the "Medical Care Programs Administration."

The funds for Medical Assistance State Only represent a small portion of the funds listed in the Budget Bill under "Medical Care Provider Reimbursements." The category of "Medical Care Provider Reimbursements" represents a significant portion of the sum appropriated under the heading "Medical Care Programs Administration." The elimination of the Medical Assistance State Only grant reduced the sum listed under the "Medical Care Provider Reimbursements" by less than one and one-half percent. Similarly, it reduced the sum listed as the total appropriation to the "Medical Care Programs Administration" by less than one and one-half per-

cent. Whether we assess the reduction in terms of the total appropriation to the "Medical Care Programs Administration" or in terms of the portion of that total appropriation listed under the category of "Medical Care Providers Reimbursements," it is clear that the reduction did not exceed 25%. The action of the Governor and the Board of Public Works conformed to the requirements of law.[20]

Section 7–213 provides a mechanism by which the Governor can fulfill his constitutional obligation to maintain a balanced budget and to avoid a deficit when the estimated revenues used in the budget bill are too high. The power of the Governor to reduce appropriations under § 7–213 is consistent with the power of the Governor in the budgetary process, and, as proven in 1933 and 1935 as well as in the 1990's, is "necessary . . . to carry out"[21] the balanced budget requirement of Art. III, sec. 52(5a).

*JUDGMENT AFFIRMED, WITH COSTS.*

---

**20.** Although not raised in their petition for a writ of certiorari, the plaintiffs in their brief also claim that the Governor may not eliminate the Medical Assistance State Only grant because the General Assembly has mandated that there be funding. We agree with the State that this grant does not have a "level of funding prescribed by law" within the meaning of Art. III, § 52(11) and (12), because it does not "prescribe a dollar amount or an objective basis from which a level of funding can be easily computed." 65 Att'y Gen. Ops. 108, 110 (1980). Moreover, the constitutional restriction applies only to the Governor's proposed expenditures in the initial budget.

**21.** Article III, § 52(13), of the Maryland Constitution.